AO 91 (Rev. 11/11) Criminal Complaint

AUSA Erin Kelly (312) 886-9083

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

UNITED STATES OF AMERICA

v.

CARLOS JAMES;
SAMUEL BROOKS;
PAURICE ROSE;
DONALD WILLIAMS;
VASHON JAMES;
DAVID LAMB;
FELICIA SINGLETON;
THOMAS BIRT;
AVIS KNIGHT; and
HAYDEE CANO



Case No. 1:22-cr-00516

**UNDER SEAL**

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief:

From or on about April 7, 2021 through August 31, 2022, at Chicago, in the Northern District of Illinois, Eastern Division, and elsewhere, the defendants violated:

| Code Section | Offense Description |
| --- | --- |
| Title 21, United States Code, Section 846 | did conspire with each other, and with others known and unknown, to knowingly and intentionally possess with intent to distribute and distribute a controlled substance, namely, 400 grams or more of a mixture and substance containing a detectable amount of fentanyl (N-phenyl-N-[1-(2-phenylethyl)-4-piperindinyl] propanamide), a Schedule II Controlled Substance, one kilogram or more of a mixture and substance containing a detectable amount of heroin, a Schedule I Controlled Substance, and a mixture and substance containing a detectable amount of cocaine base, a Schedule II Controlled Substance, in violation of Title 21, United States Code, Section 841(a)(1). |

This criminal complaint is based upon these facts:

   <u>X</u>   Continued on the attached sheet.

<u>BLAIR SANTASPIRT</u>
BLAIR SANTASPIRT
Special Agent, Federal Bureau of Investigation (FBI)

Sworn to before me and signed in my presence.

Date: <u>October 13, 2022</u>

_____
*Judge's signature*

City and state: <u>Chicago, Illinois</u>

<u>BETH W. JANTZ</u>, U.S. Magistrate Judge
*Printed name and Title*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS  ss

### **AFFIDAVIT**

I, BLAIR SANTASPIRT, being duly sworn, state as follows:

1.     I am a Special Agent with the Federal Bureau of Investigation ("FBI"), and have been so employed for 3 years.  My current responsibilities include the investigation of narcotics trafficking offenses.

2.     This affidavit is submitted in support of a criminal complaint alleging that, beginning no later than on or about April 7, 2021 and continuing to August 31, 2022 in the Northern District of Illinois and elsewhere, defendants SAMUEL BROOKS ("BROOKS"), CARLOS JAMES, PAURICE ROSE ("ROSE"), VASHON JAMES, DONALD WILLIAMS, THOMAS BIRT ("BIRT"), FELICIA SINGLETON ("SINGLETON"), AVIS KNIGHT ("KNIGHT"), and HAYDEE CANO ("CANO") did conspire with each other, and with others known and unknown, to knowingly and intentionally possess with intent to distribute and distribute a controlled substance, namely, 400 grams or more of a mixture and substance containing a detectable amount of fentanyl (N-phenyl-N-[1-(2-phenylethyl)-4-piperindinyl] propanamide), a Schedule II Controlled Substance, one kilogram or more of a mixture and substance containing a detectable amount of heroin, a Schedule I Controlled Substance, and a mixture and substance containing a detectable amount of cocaine base, a Schedule II Controlled Substance in violation of Title 21, United States Code, Section 841(a)(1), in violation of Title 21, United States Code, Section 846.

3.     The information in this affidavit is based on my participation in this investigation; information provided by other local and federal law enforcement officers; information from a cooperating source; the results of physical and video surveillance; review of consensually recorded conversations and in-person meetings; information derived from court-authorized interceptions of wire communications[1]; telephone records, including subscriber information, toll records, pen registers, trap and trace information, and phone location monitoring; law enforcement reports; my training and experience; and the training and experience of other law enforcement officers with whom I have consulted.

4.     Because this affidavit is being submitted for the limited purpose of establishing probable cause in support of a criminal complaint and the issuance of arrest warrants against the proposed defendants I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe are necessary to establish probable cause to believe that the defendants committed the offenses alleged in the complaint.

---

[1]     On or about February 28, 2022, Acting Chief Judge Virginia Kendall authorized the interception of wire communications to and from Target Phone 1 for a period not to exceed thirty days (the "February 28, 2022 Affidavit"). Interceptions of Target Phone 1 began on or about February 28, 2022 and ended on or about March 29, 2022.

On or about April 8, 2022, Chief Judge Rebecca Pallmeyer authorized the initial interception of wire communications to and from telephone number (708) 800-4239, a phone used by CARLOS JAMES ("Target Phone 2") for a period not to exceed thirty days (the "April 8, 2022 Affidavit"). Interceptions of Target Phone 2 began on or about April 8, 2022 and ended on or about May 7, 2022. On or about May 23, 2022, Chief Judge Pallmeyer authorized the renewed interception of wire communications to and from Target Phone 2 for a period not to exceed thirty days (the "May 23, 2022 Affidavit"). Renewed interceptions of Target Phone 2 began on or about May 23, 2022 and ended on or about June 22, 2022.

## FACTS SUPPORTING PROBABLE CAUSE

### I.    Background of the CARLOS JAMES DTO

5.    Since approximately April 7, 2021, the Federal Bureau of Investigation ("FBI"), the Internal Revenue Service ("IRS"), and the Chicago Police Department (the "CPD") have conducted a criminal investigation into a drug trafficking organization (the "CARLOS JAMES DTO" or "DTO") responsible for distributing fentanyl-laced heroin and crack cocaine on the northwest side of Chicago, specifically from approximately North Avenue to Bloomingdale Avenue and from Austin Avenue to Central Avenue (the "DTO Territory").    As part of that investigation, law enforcement officials introduced a confidential source ("CS-2")[2] to the CARLOS JAMES DTO, who made approximately nine controlled purchases of fentanyl-laced heroin and crack cocaine from the DTO.

### A.    Roles of the Defendants

6.    Based on my training and experience, from my conversations with confidential sources, the training and experience of other law enforcement officers

---

[2]    CS-2 started cooperating in this investigation in approximately October 2021 and has provided information regarding this investigation to the CPD and the FBI.  CS-2 has four prior felony convictions for narcotics possession in 1998, 2002, 2003, and 2006.  CS-2 has provided information to CPD and FBI on various investigations between approximately July 2018 and November 2021. Prior to assisting in this investigation, CS-2 did not know SAMUEL BROOKS.  CS-2 is cooperating in this investigation in exchange for monetary compensation.  For CS-2's cooperation in this investigation and in other investigations to date, the FBI has paid CS-2 approximately $11,150.  CPD has not paid CS-2 for his/her assistance in this investigation.    The information provided by CS-2 related to this investigation has been corroborated through surveillance, law enforcement databases, and consensually-recorded conversations as described in this Affidavit.    Based on law enforcement dealings with CS-2 and the information provided in this Affidavit, I consider CS-2 to be credible and believe that the information provided by CS-2 is reliable.

involved in this investigation, and my knowledge of the investigation, I am familiar with various characteristics of street-level drug trafficking organizations and their use of designated drug trafficking locations as "drug spots." For example, I am aware that:

a. DTOs operating on the street level are typically hierarchical organizations with individuals who have connections to narcotics suppliers, liaise with the suppliers, obtain bulk narcotics, and cut and re-package the narcotics to increase the quantity of narcotics available for distribution and adjust the potency of the narcotics. DTOs operating on the street-level often have street-level bosses or managers, who supervise street-level traffickers, assist in serving customers, and obtain narcotics proceeds, which are later provided to the individuals with connections to the suppliers to obtain additional quantities of narcotics. Street-level traffickers distribute narcotics to customers in hand-to-hand transactions in exchange for cash. Often times, DTOs store narcotics and/or narcotics proceeds in homes and vehicles, which serve as stash locations. Street-level bosses and street-level traffickers typically deal in smaller quantities because they are serving end-use customers and because they seek to minimize losses in case of a seizure or robbery and legal exposure by possessing and distributing smaller amounts of narcotics, which are associated with lower penalties.

b. Narcotics traffickers, including drug spot workers, use a number of methods to evade detection by law enforcement, including, for example: using cellular phones or messaging applications registered to fictitious or false names or

nicknames; using coded language to identify themselves and to discuss and conduct their illegal activities; frequently changing cellular phone numbers or messaging application accounts, or using multiple phone and messaging accounts simultaneously.

      c.    DTOs typically package between 12 and 14 individual doses of heroin (called "blows" or "bags"), together, which is referred to as a "jab." Each "blow" sold by the CARLOS JAMES DTO in a "jab" contains approximately .4 to .6 grams of heroin.

      d.    After packaging the heroin in this manner, DTO members distribute the jabs to the street-level traffickers for resale to individual customers. During this investigation, law enforcement officials learned from controlled purchases and seizures of narcotics from the CARLOS JAMES DTO that the CARLOS JAMES DTO used a unique style of packaging, specifically, each individual user quantity of fentanyl-laced heroin was stapled into sets of two baggies each to comprise one "blow," with constituted approximately .4 or .6 grams of fentanyl-laced heroin.

      7.    Based on the investigation, including approximately nine controlled purchases, surveillance, a review of CPD pod and pole camera footage, and intercepted wire communications to and from telephones used by CARLOS JAMES and BROOKS, the investigation has revealed that:

      a.    CARLOS JAMES was the leader of the CARLOS JAMES DTO and worked directly with BROOKS, ROSE, VASHON JAMES, and WILLIAMS to

ensure that the DTO had sufficient quantities of fentanyl-laced heroin and crack cocaine to distribute to street-level customers.

b.     ROSE traveled to suspected DTO stash house locations, including 1742 North Mayfield Avenue, Unit 1, in Chicago (the "1742 Mayfield Address") and 3534 Flournoy Avenue, Unit 1, in Chicago (the "Flournoy Address"), to help CARLOS JAMES prepare and package fentanyl-laced heroin for street distribution.  CARLOS JAMES and ROSE then distributed the packaged narcotics to BROOKS, a street-level manager for the DTO.

c.     BROOKS gave LAMB, SINGLETON, BIRT, KNIGHT, and CANO narcotics to distribute to street-level customers for the DTO.  BROOKS also sold heroin and crack cocaine directly to street-level customers.

d.     VASHON JAMES prepared crack cocaine for the DTO and collected narcotics proceeds.  VASHON JAMES also directed that BROOKS distribute fentanyl-laced heroin to BIRT when BIRT needed an additional supply.

e.     CANO lived with BROOKS in the basement apartment of 1700 North Mango Avenue in Chicago, another DTO stash location (the "Mango Avenue Apartment").  At BROOKS's request, CANO distributed narcotics and narcotics proceeds from the Mango Avenue Apartment to DTO members and street-level customers.

**B.     Summary of Probable Cause**

8.     Between approximately April 7, 2021 and August 31, 2022, the CARLOS JAMES DTO distributed at least 35 kilograms of fentanyl-laced heroin and at least

1.1 kilograms of crack cocaine to individual street-level customers within the DTO Territory. Specifically, and as discussed in greater detail below:

      a.    Between on or about September 15, 2021 and on or about February 7, 2022, CS-2 purchased approximately 76.99 grams of fentanyl-laced heroin, and .52 grams of crack cocaine over the course of approximately 9 controlled separate purchases within the DTO Territory. These transactions included:

          i.    On or about October 14, 2021, BROOKS distributed approximately 2.5 grams of fentanyl-laced heroin to CS-2;

          ii.    On or about January 4, 2022, BROOKS distributed approximately 33.4 grams of fentanyl-laced heroin to CS-2; and

          iii.    On or about February 7, 2022, BROOKS distributed approximately 17.9 grams of fentanyl-laced heroin to CS-2.

      b.    Throughout the conspiracy, CARLOS JAMES, ROSE, and BROOKS managed the DTO's narcotics supply, monitoring inventory and keeping DTO members supplied for street-level sales. Among other things:

          i.    CARLOS JAMES obtained fentanyl-laced heroin for the DTO;

          ii.    WILLIAMS prepared and packaged crack cocaine to distribute to DTO members;

          iii.    CARLOS JAMES and ROSE packaged the fentanyl-laced heroin for DTO members, including BROOKS, to distribute to narcotics customers.

iv.      VASHON JAMES prepared crack cocaine, distributed narcotics, and collected narcotics proceeds for the DTO;

v.      BROOKS distributed narcotics from the vicinity of 1700 North Mango Avenue in Chicago (the "Mango Avenue Address") and throughout the DTO Territory.

vi.      BROOKS also managed street-level dealers and supplied LAMB, SINGLETON, BIRT, and KNIGHT with narcotics to sell to street customers. BIRT and SINGLETON distributed narcotics from the vicinity of 1638 North Mayfield Avenue in Chicago (the "1638 Mayfield Address"). KNIGHT distributed narcotics in the vicinity of the 1800 block of North Mayfield Avenue in Chicago and conducted mobile sales on a bicycle. LAMB sold narcotics throughout the DTO Territory on foot and bicycle.

vii.      On or about June 7, 2022, law enforcement officials observed ROSE drive from the vicinity of the Flournoy Address.  After law enforcement officials observed ROSE commit traffic violations, including speeding, crossing the center line, and failing to use a turn signal, law enforcement officials performed a traffic stop and recovered approximately 11 baggies containing a white powdery substance from within ROSE's leg brace.  The substance lab-tested positive for approximately 4.885 grams of fentanyl and heroin.

viii.      Throughout the conspiracy, CARLOS JAMES, BROOKS, VASHON JAMES, WILLIAMS, LAMB, BIRT, SINGLETON, and KNIGHT discussed the management and operation of the DTO, including: (1) the coordinated efforts of

all street-level traffickers selling narcotics in the DTO Territory; (2) sales of narcotics in the DTO Territory; (3) the quality of the narcotics sold in the DTO Territory; (4) the coordination of efforts to monitor and avoid detection by law enforcement officials; (5) the possession of firearms; (6) the staffing and hiring of street-level traffickers; and (7) the monitoring of the narcotics supply.

ix. On or about August 31, 2022, law enforcement officials executed a judicially-authorized search of the Mango Avenue Apartment and a consent search of a Honda Accord that is registered to CANO and used by BROOKS ("Brooks Vehicle 2").[3] During the searches, law enforcement officials seized, among other things: (1) a safe located in the primary bedroom closet containing approximately 25 jabs of a white powdery substance of suspected fentanyl-laced heroin (approximately 300 to 350 "blows" or 120 to 210 grams); (2) approximately 7 jabs (84 to 98 blows or 33.6 to 58.8 grams) of a white powdery substance of suspected fentanyl-laced heroin scattered throughout the primary bedroom; (3) a large white reusable grocery bag with the lettering "ALDI" that contained multiple food cans with false bottoms; (3) small plastic baggies of suspected narcotics packaging; (4) two handwritten ledgers located in the primary bedroom and Brooks Vehicle 2 tracking debts owed to BROOKS for narcotics sales to DTO customers; and (5) a total of four loaded firearms seized from the primary bedroom and a second bedroom.

---

[3] Brooks Vehicle 2 has registration CY15992 and is registered to CANO at the Mango Avenue Address.

x. On or about August 31, 2022, law enforcement officials executed a judicially-authorized search warrant of Unit 1 of the 1638 Mayfield Address, a DTO stash location. During the search of the basement area of Unit 1, law enforcement officials seized, among other things: (1) approximately 32 rounds of ammunition located in the rafters, on the floor, inside a shoe box, and inside of drawers; (2) a baggie of a blue rock-like substance of suspected crack cocaine[4]; (3) at least 20 small blue-colored baggies that are similar in size and color to the baggies distributed by DTO members BROOKS, BIRT, and SINGLETON during controlled purchases of narcotics dated on or about April 7, 2021, September 15, 2021, and September 16, 2021; and (4) clear narcotics packaging bags, matching the packaging seized during the June 1, 2022 trash pull described below.

c. Based on the quantity of narcotics purchased by CS-2 throughout the course of the investigation, surveillance, BROOKS's narcotics ledger, and CPD pod and pole camera video reflecting street-level traffickers in the DTO Territory appearing to engage in narcotics transactions, law enforcement officials believe that, between April 7, 2021 and August 31, 2022, the CARLOS JAMES DTO possessed with intent to distribute and distributed at least 400 to 600 grams of fentanyl-laced heroin on a weekly basis in addition to quantities of crack cocaine.

---

[4] The FBI submitted the suspected crack cocaine to the DEA Laboratory and is waiting for the results. The substance was not field-tested.

## II.    On or about April 7, 2021, BROOKS Distributed Heroin to a DTO Customer and Told Law Enforcement Officials That He Sells Narcotics

9.     On or about April 7, 2021, law enforcement officials conducted surveillance in the area of the 5900 block of West Bloomingdale Avenue in Chicago, a location within the DTO Territory.  Law enforcement officials observed BROOKS[5] engage in a suspected narcotics transaction with Individual A.  Specifically, during their surveillance, law enforcement officials observed:

a.     BROOKS lean into the passenger side window of a Volkswagen, briefly interact with the passenger, Individual A, and then walk towards a white minivan bearing registration BL91475 ("Brooks Vehicle 1").[6]

10.     Law enforcement officials approached BROOKS after he entered Brooks Vehicle 1 and sat in the front driver's seat.  Law enforcement officials were not wearing police uniforms or equipped with body-worn cameras, and their interaction with BROOKS was not recorded.  According to the law enforcement officials, during the encounter:

a.     BROOKS appeared to be attempting to conceal unknown objects with his right hand and placed his hand under his leg as the law enforcement officials approached him.  A law enforcement official asked that BROOKS step out of the

---

[5]     During the encounter discussed below, BROOKS identified himself by name.  In addition, on or about December 27, 2018, law enforcement officers previously seized from BROOKS approximately .2 grams of a substance that lab-tested positive for heroin. BROOKS was not charged with the December 27, 2018 seizure.

[6]     The white minivan is registered to BROOKS at the 1638 North Mayfield Address.

vehicle. After initially hesitating, BROOKS exited Brooks Vehicle 1 with his fist clutched.

b. A law enforcement official asked BROOKS to hand him what he was carrying. BROOKS opened his hand and gave the law enforcement officials a clear plastic bag containing approximately ten multi-colored baggies of a white powdery substance that weighed approximately 2.721 grams and lab tested positive for fentanyl and heroin, and approximately nine baggies of white rock-like substance that weighed approximately .922 grams and lab tested positive for cocaine base. During their search of Brooks Vehicle 1, law enforcement officials recovered approximately 28 multi-colored baggies of a white powdery substance that weighed approximately 6.983 grams and lab tested positive for fentanyl and heroin.

c. A law enforcement official asked BROOKS if he had any additional narcotics on his person or in his vehicle, and BROOKS gave the law enforcement officials his verbal consent to search Brooks Vehicle 1. The law enforcement officials found a knotted clear plastic bag containing multi-colored smaller baggies of a white powdery substance inside a cup resting on the center console of the vehicle. BROOKS also had large wads of money on his person.[7]

d. BROOKS told the law enforcement officials that he had just delivered a "blow" to Individual A, and that Individual A paid BROOKS $10 for the blow.

e. In addition, BROOKS told the law enforcement officials that:

---

[7] The law enforcement officials did not count the currency or seize it from BROOKS.

1.　　He earns approximately $400 to $500 each day selling narcotics.

2.　　He sells "jabs" of heroin, which is a bag containing approximately 14 blows, for a price of $140. Of that amount, BROOKS keeps $40 of the sale price and gives his narcotics supplier the remaining $100.[8] BROOKS refused to identify his narcotics supplier or the individual who monitors the stash house.

3.　　On a "good day," he sells up to 9 jabs of heroin (approximately 126 blows), which, based on my training and experience, has a street value of approximately $1,260.

f.　　A law enforcement official told BROOKS, as a ruse, that officers were present due to recent shootings in the area. BROOKS told the law enforcement official that "shorties," a street term for juveniles, were involved in the shootings. The law enforcement official, as a ruse, asked that BROOKS identify his phone number in the event that law enforcement officers wished to follow up with him regarding shootings in the area. BROOKS identified his telephone number as XXX-XXX-4566 (hereinafter Target Phone 1) and stated that he lives in the basement apartment of 1638 North Mayfield Avenue in Chicago.[9]

---

[8]　　Thereafter, on or about March 3, 2022 at approximately 12:54 p.m. (TP1 Session 701), BROOKS, using Target Phone 1, received an incoming call from telephone number XXX-XXX-0888, used by an unknown male (UM-0888). During the call, BROOKS quoted UM-0888 a price of $100 for 12 blows.

[9]　　BROOKS was not charged with any offenses arising out of the April 7, 2021 narcotics transaction or the law enforcement officials searches of his person or vehicle.

11.     During the law enforcement officials' investigative stop of BROOKS, a law enforcement official approached Individual A and observed that he/she was clutching his/her right hand.  The law enforcement official asked that Individual A open his/her hand, and Individual A handed the officer two small baggies that were stapled together and contained suspected heroin. Individual A stated that he/she had just purchased a "blow" and used heroin for pain relief.

## III.     Controlled Purchases of Narcotics from SINGLETON, BIRT, and BROOKS

12.     As described below, between on or about September 15, 2021 and February 7, 2022, CS-2 purchased approximately 76.99 grams of fentanyl-laced heroin, and approximately .52 grams of crack cocaine over the course of approximately 9 separate controlled purchases from SINGLETON, BIRT, and BROOKS.

### A.     September 15, 2021 and September 16, 2021 Purchases of Fentanyl-Laced Heroin and Crack Cocaine from SINGLETON and BIRT

13.     On or about September 15, 2021, CS-2 traveled to the vicinity of the 1638 Mayfield Address to purchase narcotics.[10]  According to a review of an audio and video recording of the encounter and CS-2[11]:

---

[10]     Before each transaction with BIRT, SINGLETON, and BROOKS described below, law enforcement officials met with CS-2 at a predetermined location and searched his/her person for any contraband and large amounts of U.S. currency with negative results.  CS-2 remained under law enforcement surveillance through the completion of the transactions and was provided with audio and video recording equipment.

[11]     Some of the consensually recorded conversations and meetings (the "recorded conversations") have been summarized in this Affidavit. I based the language quoted from the recorded conversations throughout this Affidavit on a preliminary review of the recorded

a.     CS-2 approached SINGLETON,[12] who identified herself as "C," and asked her where Individual B[13] was located.   SINGLETON asked CS-2 what he/she wished to purchase, and CS-2 asked for "two sawbucks on the realest" and "two on the soft," which, based on my training and experience and knowledge of the investigation, refers to two baggies of crack cocaine and two baggies of heroin.

b.     SINGLETON departed the area and, a short time later, walked on the front walkway of the 1638 Mayfield Address towards the street and met with CS-2.   CS-2 gave SINGLETON $40 in exchange for two baggies of a white powdery substance stapled together to comprise one blow and two baggies of a white rock-like substance of suspected crack cocaine.   According to the DEA laboratory, the baggies that SINGLETON distributed to CS-2 consisted of approximately 1.21 grams of a substance that contained heroin and fentanyl and approximately .204 grams of a substance that contained cocaine base.

---

conversations—and not on final transcripts of the recorded conversations. The summaries of the recorded conversations do not include all statements made or topics covered during the course of the recorded conversations. At various points in this Affidavit, I have included in brackets my interpretation of words and phrases used during the recorded conversations. I based my interpretations on the content and context of the recorded conversations, events occurring before or after the recorded conversations, information received from confidential sources, my knowledge of the investigation as a whole, my training and experience, and the training and experience of other law enforcement officers involved in this investigation.

[12]     Law enforcement officials positively identified SINGLETON based on: (1) a review of a CPD photograph of SINGLETON and a comparison of that photograph to the person interacting with CS-2 on or about September 15, 2021; (2) CS-2's review of SINGLETON's CPD photograph and identification of SINGLETON as the individual who sold CS-2 narcotics; and (3) SINGLETON's identification of her telephone number to CS-2, which, according to T-Mobile, is subscribed to SINGLETON.

[13]     CS-2 referred to Individual B by a street name.  Individual B is another individual who sold narcotics within the DTO Territory during the course of the charged conspiracy.

     c.    CS-2 asked SINGLETON, "Who can I call that will come through at nighttime?" SINGLETON stated, "You can call me" and identified her phone number as XXX-XXX-9885 ("Singleton Phone 1").

    14.    The next day, on or about September 16, 2021, CS-2 traveled to the 1638 Mayfield Address and made a controlled purchase of three individual user quantities of fentanyl-laced heroin and crack cocaine from BIRT.[14] As observed on an audio and video recording of the encounter:

    a.    BIRT removed three yellow-tinted baggies that were stapled to three pink-tinted baggies containing a white powdery substance from his right shoe and gave them to CS-2. Consistent with prior distributions by the DTO, the baggies that BIRT distributed to CS-2 were stapled together to comprise one blow. The white powdery substance that BIRT distributed to CS-2 weighed approximately 1.58 grams and lab-tested positive for heroin and fentanyl.

    b.    BIRT then went inside the 1638 Mayfield Address, departed a short time later, and gave CS-2 three additional baggies of a rock-like substance in three green-tinted baggies in exchange for $60 in government funds. The rock-like substance that BIRT distributed to CS-1 weighed approximately .317 grams and lab-tested positive for cocaine base.

---

[14]    On or about January 25, 2018, the CPD arrested BIRT for possessing open alcohol in a public way. Law enforcement officials positively identified BIRT through a comparison of a CPD booking photograph to the person depicted on CS-2's video camera as interacting with CS-2. Further, law enforcement officials have interacted with BIRT in the area of the DTO's operations and recognized him from their community interactions with him.

**B.** **Purchases of Fentanyl-Laced Heroin from BROOKS**

15.     On or about October 6, 2021, October 14, 2021, October 20, 2021, November 4, 2021, November 9, 2021, January 4, 2022, and February 7, 2022, CS-2 contacted BROOKS[15] on Target Phone 1 to arrange controlled purchases of narcotics from BROOKS.

16.     The October 2021 and November 2021 distributions by BROOKS to CS-2 are summarized below. During those controlled purchases, I observed that the narcotics BROOKS sold were comprised of two individual baggies stapled together to comprise one "blow" of heroin or suspected heroin.

| DATE | APPROXIMATE QUANTITY | LABORATORY RESULTS | PRICE |
|---|---|---|---|
| October 6, 2021 | 2 grams | Fentanyl and Heroin | $40 |
| October 14, 2021 | 2.5 grams | Fentanyl and Heroin | $100 |
| October 20, 2021 | 5.9 grams | Fentanyl and Heroin | $100 |
| November 4, 2021 | 12.5 grams | Fentanyl and Heroin | $200 |
| November 9, 2021 | 20 grams | Fentanyl and Heroin | $300 |

---

[15]     The identification of BROOKS, and BROOKS as the user of Target Phone 1, is based in part on the following: (1) on or about April 7, 2021, BROOKS identified his telephone number to law enforcement as the call number of Target Phone 1; (2) law enforcement officials positively identified BROOKS based on its review of a known photograph of BROOKS contained in CPD records and a comparison of that photograph to the person interacting with CS-2 on or about October 6, 2021, October 14, 2021, October 20, 2021, November 4, 2021, November 9, 2021, and January 4, 2022; and (3) BROOKS used Target Phone 1 to arrange meetings with CS-2, and law enforcement officials compared the voice heard in the recorded telephone conversations with CS-2 to (i) the voice heard during their in-person conversation with BROOKS on April 7, 2021, and (ii) in the recordings of the November 4, 2021, November 9, 2021, and January 4, 2022 controlled narcotics purchases between CS-2 and BROOKS, and determined that the person interacting with CS-2 is BROOKS.

1.  **On or about January 4, 2022, BROOKS and CARLOS JAMES Distributed Approximately 33.4 Grams of Fentanyl-Laced Heroin to CS-2**

17.    On or about January 4, 2022, law enforcement officials provided CS-2 with $400 in government funds to purchase narcotics from BROOKS and equipped CS-2 with audio and video recording equipment.

18.    At approximately 1:33 p.m., CS-2 had a consensually-recorded conversation with BROOKS, using Target Phone 1. During the call, CS-2 asked that BROOKS sell him "four jabs," meaning four jabs of heroin, for approximately $400. BROOKS told CS-2, "I just sell out," and "You gotta give me a minute. About an hour," indicating that BROOKS did not currently have the requested quantity of narcotics in his possession and would need to re-up his supply.

19.    At approximately 1:42 p.m., BROOKS, using Target Phone 1, called CS-2. BROOKS stated, "I gotta go get it. Get it real quick," meaning that BROOKS needed to obtain the supply of narcotics. BROOKS and CS-2 agreed to meet at a Walgreens store for the narcotics transaction.

20.    According to T-Mobile's records, at approximately 1:58 p.m., BROOKS, using Target Phone 1, called CARLOS JAMES, using telephone number XXX-XXX-4239 ("Target Phone 2").[16] The duration of the call was approximately one minute

---

[16]    The identification of CARLOS JAMES, and CARLOS JAMES as the user of Target Phone 2, is based in part on the following: (1) T-Mobile's records show that the account for Target Phone 2 is registered to Carlos James at the address of 4533 West Jackson Blvd, Apt 2, Chicago, Illinois 60624; (2) on or about March 21, 2022 (TP1 Sessions 4724, 4726), during intercepted communications over Target Phone 1, BROOKS referred to the user of Target Phone 2 as "Carlos" without being corrected; and (3) law enforcement conducting surveillance observed CARLOS JAMES meet with BROOKS, as referenced in intercepted communications over Target Phone 1. Law enforcement officials conducting surveillance

18

and one second. Based on my training and experience, the training and experience of other law enforcement officers involved in this investigation, and my knowledge of the investigation, I believe that, based on BROOKS's statements to CS-2 that "I just sell out" and that he "gotta go get it," BROOKS called CARLOS JAMES to obtain an additional supply of narcotics to distribute to CS-2.

21.     According to law enforcement officials conducting surveillance, a review of the audio and video recording of the below encounter, historical call records, and CS-2:

a.      At approximately 2:06 p.m., BROOKS picked up CS-2 in a Honda Accord with registration CY15992 ("Brooks Vehicle 2")[17] from the Walgreens parking lot located at North Avenue and Central Avenue in Chicago.

b.      At approximately 2:08 p.m., BROOKS and CS-2 arrived in the vicinity of the Mango Avenue Address and parked on Wabansia Avenue, west of Mango Avenue. BROOKS and CS-2 remained inside Brooks Vehicle 2 for a period of time after BROOKS parked the vehicle.

c.      At approximately 2:10 p.m., while BROOKS and CS-2 were inside Brooks Vehicle 2, CARLOS JAMES, using Target Phone 2, called BROOKS, using Target Phone 1. As depicted on CS-2's audio and video recording, BROOKS answered an incoming call. According to a review of the audio and video recording, BROOKS

---

recognized CARLOS JAMES as the person who met with BROOKS by reviewing his driver's license photograph and a CPD booking photograph.

[17]     According to the Illinois Secretary of State, in approximately October 2021, BROOKS sold Brooks Vehicle 2 to CANO with a registration address of the Mango Avenue Apartment.

stated the following during his conversation with CARLOS JAMES.[18]

| BROOKS: | Hello? |
| BROOKS: | I'm right here in front of my house. |
| BROOKS: | Where, where? You want me to come over there or what? |
| BROOKS: | Alright. Okay. Here I come. |

22.     Based on my training and experience, the training and experience of other law enforcement officers involved in this investigation, and my knowledge of the investigation, I believe that in the above exchange:  (1) BROOKS told CARLOS JAMES that he was in front of his residence (the Mango Avenue Address); and (2) BROOKS asked CARLOS JAMES whether he intended to deliver the narcotics to BROOKS and CARLOS JAMES told BROOKS to pick up narcotics from CARLOS JAMES and BROOKS agreed.

23.     At approximately 2:11 p.m., BROOKS and CS-2 exited Brooks Vehicle 2 and entered the Mango Avenue Address.  As depicted on CS-2's audio and video recording device, BROOKS and CS-2 entered the front door of the Mango Avenue

---

[18]     According to T-Mobile's records, on January 4, 2022, CARLOS JAMES, using Target Phone 2, placed three calls to BROOKS, using Target Phone 1, in short succession, and it appears that from CS-2's audio and video recording device, conversation duration, and toll records, that CARLOS JAMES and BROOKS spoke during the third call identified in the toll records.  Two of the inbound calls were approximately two seconds each and the third call was approximately 12 seconds long. Because the call between BROOKS and CARLOS JAMES was not on speakerphone, CS-2's recording device captured BROOKS's side of the conversation.  CS-2's audio and video recording device had an erroneous time stamp of 12:44 a.m. and a date stamp of November 24, 2021.  Thus, the time and date stamps on CS-2's audio and video recording do not match T-Mobile's records.

Address, walked downstairs, and entered the Mango Avenue Apartment. There, CS-2 met LAMB and CANO.[19]

24.     Starting at approximately 2:13 p.m., law enforcement officials conducting surveillance of the 1742 Mayfield Address observed a black Dodge minivan park nearby.[20] Law enforcement officials observed CARLOS JAMES[21] exit the front passenger seat of the Dodge minivan and walk towards the 1742 Mayfield Address. About one minute later, an unidentified male parked the Dodge minivan, exited the vehicle, and stood on the sidewalk near the 1742 Mayfield Address.

25.     According to law enforcement officials conducting surveillance, at approximately 2:14 p.m., BROOKS exited the Mango Avenue Address, entered Brooks Vehicle 2, and departed the area. According to CS-2 and as depicted on CS-2's recording device, CS-2 waited inside the Mango Avenue Apartment while BROOKS obtained the supply of narcotics.

26.     According to law enforcement officials conducting surveillance near the 1742 Mayfield Address and T-Mobile's records:

---

[19]     Law enforcement officials and CS-2 identified LAMB by comparing the person depicted in CS-2's video of the transaction to a CPD booking photo of LAMB taken on or about July 14, 2021, when law enforcement officials seized approximately .2 grams of fentanyl-laced heroin from LAMB in the vicinity of Bloomingdale Avenue and Monitor Avenue in Chicago. CS-2 identified CANO as the person he/she observed during the January 4, 2022 controlled purchase after seeing a CPD booking photograph of CANO. In addition, as described in footnote 17 above, Brooks Vehicle 2 is registered to CANO at the Mango Avenue Apartment.

[20]     Law enforcement officials did not obtain the registration for the vehicle.

[21]     Law enforcement officials identified CARLOS JAMES by his driver's license photograph and CPD booking photograph.

a.      At approximately 2:16 p.m., BROOKS parked near the 1742 Mayfield Address and walked towards the front entrance of the building.

b.      At approximately 2:17 p.m., BROOKS, using Target Phone 1, received a call from CARLOS JAMES, using Target Phone 2.  The call had a duration of approximately twelve seconds.  Law enforcement officials did not observe BROOKS handling his cellular phone.

c.      At approximately 2:18 p.m., BROOKS entered the front door of the 1742 Mayfield Address, followed by the unidentified male who had been standing outside on the sidewalk.

d.      At approximately 2:25 p.m., BROOKS exited the front door of the 1742 Mayfield Address carrying a large white reusable grocery bag with a dark-colored bottom and the lettering "ALDI" that appeared to be weighted with an object.[22]  Shortly thereafter, the unidentified male and CARLOS JAMES exited the front door of the 1742 Mayfield Address.

27.      Based on my training and experience, the training and experience of other law enforcement officers involved in this investigation, and my knowledge of the investigation, I believe that BROOKS met with CARLOS JAMES at the 1742

---

[22]      As discussed below, on or about August 31, 2022, law enforcement officials executed a search at the Mango Avenue Apartment, where they seized, among other things, a large white reusable grocery bag with the lettering "ALDI" that contained Arizona-brand drink bottles and Pringles-brand cans with false bottoms.  Accordingly, based on that seizure, the surveillance discussed herein, reflecting BROOKS and CARLOS JAMES transporting ALDI bags, and the narcotics distributions and conversations regarding narcotics distributions discussed herein, law enforcement officials believe that ALDI bags were used to transport narcotics and narcotics proceeds among the DTO.

Mayfield Address in order to obtain additional narcotics to distribute to CS-2 at the Mango Avenue Apartment inside the Mango Avenue Address.

28.     While BROOKS traveled to pick up the narcotics supply from CARLOS JAMES, CS-2 stayed inside the Mango Avenue Apartment with CANO and LAMB. Based on a review of the audio and video recording, during that encounter:

        a.      CS-2 complained about how long it was taking for BROOKS to return to the Mango Avenue Apartment. CANO and LAMB then assured CS-2 that BROOKS was getting CS-2 his/her narcotics order, as set forth below:

| | |
|---|---|
| CANO: | He went to go take care of you. |
| CS-2: | Oh, okay. Alright. I was like damn what the fuck . . . . |
| CANO: | No, he [BROOKS] told me. |
| CS-2 : | I'm like what the fuck. |
| CANO: | No, no, no he went to go take care of you and he be right back. |
| CS-2: | Got my money and [U/I]. |
| CANO: | No, he went to go take care of you. That's one thing Sam don't play with money and his word. Nah. Sam got you. |
| LAMB: | Sam got you. |
| CANO: | What do you...you smoke or you blow? |
| CS-2: | I blow. |
| CANO: | You blow? Here get him. Little Dave, Little Dave [LAMB], can you give him one of your blows? |

23

29.     Thereafter, based on my review of the audio and video recording of the encounter, CS-2 attempted to change the subject by again voicing a complaint about the wait for BROOKS to return.  LAMB did not give CS-2 any heroin.

30.     Based on my training and experience, the training and experience of other law enforcement officers involved in this investigation, and my knowledge of the investigation, I believe that in the above exchange: (1) CS-2 complained about how long it took for BROOKS to return with the heroin that CS-2 ordered; (2) CANO told CS-2 that "Sam," meaning BROOKS, will return with the heroin; and (3) CANO asked that LAMB give CS-2 a blow of heroin.

31.     According to law enforcement officials conducting surveillance near the Mango Avenue Address, at approximately 2:28 p.m., BROOKS returned to the building.  Thereafter, according to CS-2 and as depicted on CS-2's recording device:

a.      BROOKS returned to the Mango Avenue Address and met with CS-2, who was waiting inside the Mango Avenue Apartment.  BROOKS gave CS-2 approximately 106 baggies (approximately 53 blows) of a white powdery substance in exchange for $400.

b.      BROOKS then retrieved a sandwich bag and gave it to CS-2 for storage of the narcotics.  CS-2 told BROOKS he would likely want to "reload" [purchase more heroin] on Sunday, and BROOKS responded would be "ready for him" [have heroin to supply].

32.     At approximately 2:37 p.m., CS-2 met with law enforcement officials at a predetermined location.  CS-2 gave law enforcement officials a bag containing

approximately four jabs or 106 individual baggies of a white powdery substance stapled into sets of two baggies each. One of the baggies that comprised each blow had a bomb symbol and the phrase "Stay High" written on the baggie, and the other baggie that comprised each blow had graphics of cars. Consistent with prior distributions by BROOKS, the baggies were stapled together to comprise one blow.

33. The 106 baggies that BROOKS distributed to CS-2 weighed approximately 33.4 grams and lab tested positive for heroin and fentanyl.

### 2. On or About February 7, 2022, BROOKS Distributed Approximately 17.9 Grams of Fentanyl-Laced Heroin to CS-2

34. On or about February 7, 2022, law enforcement officials provided CS-2 with $200 in government funds to purchase narcotics from BROOKS and equipped CS-2 with audio and video recording equipment.[23]

35. On or about February 7, 2022, at approximately 10:47 a.m., CS-2 had a consensually-recorded conversation with BROOKS, using Target Phone 1. During the call, CS-2 told BROOKS that he needed "two," meaning two jabs of heroin. BROOKS told CS-2 that he needed to come to the "house," meaning the Mango Avenue Address, to purchase the heroin.

36. According to surveillance present in the area of the Mango Avenue Address and CS-2:

---

[23] Due to a malfunctioning battery, the audio and video recording device malfunctioned after approximately five minutes of recording and did not capture the entire controlled narcotics purchase with BROOKS.

a.     At approximately 11:10 a.m., CS-2 walked westbound on Wabansia Avenue from Central Avenue and arrived at the corner of Wabansia and Mango Avenue.  CS-2 called BROOKS, using Target Phone 1.  By this point in time, the battery in CS-2's recording device had malfunctioned and their conversation was not recorded.  According to CS-2, during this conversation with BROOKS, CS-2 told BROOKS that CS-2 was outside his house.

b.     Shortly thereafter, BROOKS opened the front door to the Mango Avenue Address.  CS-2 went inside the building, BROOKS and CS-2 engaged in the narcotics transaction in the front vestibule of the Mango Avenue Address.

c.     BROOKS distributed two plastic bags that each contained smaller baggies of a white powdery substance to CS-2 in exchange for $200 in government funds.

d.     During the transaction, BROOKS and CS-2 discussed the high quality of the narcotics that CS-2 previously purchased from BROOKS and the weather.

37.     At approximately 11:19 a.m., CS-2 met with law enforcement officials at a predetermined location. CS-2 gave law enforcement officials a bag containing approximately two jabs or 50 individual baggies of a white powdery substance stapled into sets of two baggies each. One of the baggies that comprised each blow had a Batman symbol on the baggie, and the other baggie that comprised each blow had graphics of red dice.  The 50 baggies that BROOKS distributed to CS-2 weighed approximately 17.9 grams and lab-tested positive for fentanyl and heroin.

38.     Following the February 7, 2022 controlled purchase, CS-2 told law enforcement officials that BROOKS appeared to have approximately five jabs of suspected heroin in his front jacket pocket.  In addition, CS-2 said that, during their meeting, BROOKS spoke on the phone with another individual and told that person that BROOKS had three left, which CS-2 interpreted as meaning that BROOKS had three jabs of heroin left to sell.  CS-2 told law enforcement officials that BROOKS planned to meet the customer who was on the phone.

## IV.     The DTO's Distribution of Narcotics and Proceeds to its Members

### A.     On or about March 1, 2022, BROOKS and VASHON JAMES Re-Supplied BIRT with a Distribution Quantity of Narcotics

39.     On or about March 1, 2022, at approximately 2:30 p.m. (TP1 Session 124), BROOKS, using Target Phone 1, received an incoming call from XXX-XXX-3218, a phone used by VASHON JAMES (the "Vashon James Phone").[24] During the call, VASHON JAMES stated, "Could you uh, could you get Tommy [BIRT] thirteen [blows] and I give it back to you when I get over there."  BROOKS stated, "Alright."

---

[24]     AT&T's records show that the account for the Vashon James Phone is registered to Individual C at the address of 690 Whitesboro Avenue, Memphis, TN 38109.   The identification of VASHON JAMES, and VASHON JAMES as the user of the Vashon James Phone, is based in part upon the following: (1) VASHON JAMES has a public Instagram account with username "Pooch_100" and the name VASHON JAMES listed underneath the username (the "Vashon James Instagram Account"); (2) a picture of a business card for a company called Diplomatic Logistics posted to the Vashon James Instagram Account identifies Vashon A. James as the Operational Manager of the company and a business phone number of XXX-XXX-3218, the call number of the Vashon James Phone; (3) law enforcement officials compared photographs posted to the Vashon James Instagram Account to a CPD photograph of VASHON JAMES, and determined that the photographs depict the same person; and (4) on or about March 5, 2022, during a conversation intercepted over Target Phone 1, BROOKS addressed the person using the Vashon James Phone as "Pooch." (TP1 Session 1127).

VASHON JAMES stated, "I give it back to you. It's on me. It's on me." BROOKS stated," Okay, okay. Alright, alright I give it to [U/I]."

40.     Based on my training and experience, and the training and experience of other law enforcement officers involved in this investigation, I believe that in the above exchange, BROOKS agreed to give BIRT thirteen blows of heroin, and VASHON JAMES agreed to replenish BROOKS's heroin supply.

41.     On or about March 1, 2022, at approximately 3:02 p.m. (TP1 Session 143), BROOKS, using Target Phone 1, received an incoming call from XXX-XXX-9374, a phone used by BIRT (the "Birt Phone").[25]  During the call, BROOKS and BIRT had the following exchange:

| | |
|---|---|
| BIRT: | I'm finna [going to] come holler at you on the soft [heroin]. |
| BROOKS: | Alright, I'mma give you some rocks [crack cocaine] as soon as I get back. |
| BIRT: | Okay, well you know what, I'mma wait for you then. |
| BROOKS: | You don't gotta wait. Go on and get you a fresh jab [12-14 blows of heroin]. |
| BIRT: | Oh okay, you want me to go ahead and get the soft [heroin]. You gonna bring me the other one [jab of crack cocaine]? |
| BROOKS: | Yeah I bring you the other one. I got [U/I]. |

---

[25]     Law enforcement officials identified BIRT as the user of the Birt Phone based in part upon the following:  (1) during Target Phone 1 Sessions 344 and 455, BROOKS referred to the user of the Birt Phone as "Tommy," a nickname for the first name Thomas; and (2) law enforcement officials, through community interactions with BIRT, recognized the voice of the user of the Birt Phone as BIRT.

BIRT:                           Okay aight. I'm finna go take care of
                                that now then.

42.     Thereafter, beginning at approximately 3:27 p.m., law enforcement
officials conducting surveillance through a CPD pole camera and a CPD pod camera
observed BIRT ride his bicycle northbound on Mayfield Avenue and travel to the
Mango Avenue Address.  At approximately 3:37 p.m., BIRT exited the Mango Avenue
Address and traveled to the 1638 Mayfield Address.

43.     Based on my training and experience, and the training and experience
of other law enforcement officers involved in this investigation, and observations
made during surveillance, I believe that, on or about March 1, 2022:  (1) VASHON
JAMES asked that BROOKS supply BIRT with a jab of heroin for distribution and
stated that, in turn, VASHON JAMES would replenish BROOKS's heroin supply; (2)
BROOKS told BIRT to obtain a fresh supply of heroin (a "fresh jab") from the Mango
Avenue Address, and that BROOKS would give BIRT crack cocaine ("rocks") when
BROOKS returned to the area; and (3) BIRT traveled to the Mango Avenue Address
to obtain the heroin.

**B.      On or About March 2, 2022, CANO asked BROOKS
        to Re-Supply Her with Narcotics**

44.     On or about March 2, 2022, at approximately 9:47 a.m. (TP1 Session
331), BROOKS, using Target Phone 1, called XXX-XXX-3040, a phone used by CANO
(the "Cano Phone").[26]  During the call, CANO asked, "Did you leave yet?" BROOKS

---

[26]     The identification of CANO as the user of the Cano Phone is based in part on law
enforcement officials' comparison of the voice of the person using the Cano Phone (TP1

responded, "No." CANO stated, "Oh, I thought you left. Are, are you gonna reload me [re-supply CANO with narcotics] or?" BROOKS responded, "Yeah, give me the money." CANO stated, "Okay, let me get it together. Okay."

45. Based on my training and experience, the training and experience of other law enforcement officers involved in this investigation, and my knowledge of the investigation, I believe that, in the above exchange: (1) CANO asked BROOKS if BROOKS was going to "reload," or resupply, narcotics to CANO; and (2) BROOKS directed CANO to provide him with narcotics proceeds from her previous supply of narcotics.

**C.    On or About March 3, 2022, BROOKS Collected Narcotics Proceeds from SINGLETON and Re-Supplied Her with  Narcotics, and VASHON JAMES Re-Supplied BROOKS with Narcotics**

46. On or about March 2, 2022, at approximately 3:51 p.m. (TP1 Session 458), BROOKS, using Target Phone 1, made an outgoing call to XXX-XXX-3060, a second phone number used by SINGLETON ("Singleton Phone 2").[27] During the call,

---

Sessions 99, 103, 331) with the voice of the person who spoke with CS-2 during the January 4, 2022 controlled purchase of narcotics.

[27]    Law enforcement officials identified SINGLETON as the user of Singleton Phone 2 based in part on the following:  (1) law enforcement officials compared the voice of the person using Singleton Phone 2 with the voice of the person who conducted the September 15, 2021 controlled narcotics transaction with CS-2 and determined that the speakers were the same person; (2) on or about March 3, 2022, during Target Phone 1 Session 643, BROOKS referred to the user of Singleton Phone 2 as "CC," which resembles the nickname "C" that SINGLETON identified to CS-2 during the September 15, 2021 controlled purchase of suspected narcotics; and (3) on or about March 3, 2022, during Target Phone 1 Session 643, BROOKS told the user of Singleton Phone 2 that he "finna pull up."  A short time later, law enforcement officials conducting surveillance observed SINGLETON meet with the driver of Brooks Vehicle 4, described in paragraph 53 above.

BROOKS asked, "Where you at on the D [heroin]?" SINGLETON responded, "I got seven [blows of heroin]."

47.     Based on my training and experience, the training and experience of other law enforcement officers involved in this investigation, and my knowledge of the investigation, I believe that, in the above exchange, BROOKS asked SINGLETON how much "D," meaning heroin, SINGLETON had in her possession to sell to customers, and SINGLETON responded "seven," meaning seven blows of heroin.

48.     On or about March 3, 2022, at approximately 8:18 a.m. (TP1 Session 628), BROOKS, using Target Phone 1, called VASHON JAMES, using the Vashon James Phone. During this call, VASHON JAMES stated, "What's up?" BROOKS stated, "What up, man?" VASHON JAMES stated, "What you working with?" BROOKS stated, "I'm waiting on you." VASHON JAMES stated, "Alright."

49.     Based on my training and experience, the training and experience of other law enforcement officers involved in this investigation, and my knowledge of the investigation, I believe that in the above exchange, VASHON JAMES asked BROOKS about his supply of narcotics, and BROOKS told VASHON JAMES that he was "waiting on" VASHON JAMES to replenish BROOKS's supply of heroin.

50.     On about March 3, 2022, at approximately 8:42 a.m. (TP1 Session 632), BROOKS, using Target Phone 1, called SINGLETON, using Singleton Phone 2. During the call, BROOKS asked, "How do you feel?" SINGLETON responded, "I'm alright. Just need a 'lil dope. I ain't got no more." BROOKS asked, "Why ain't you call me, baby?" and stated, "I'll be over there in a minute."

51.     Based on my training and experience, the training and experience of other law enforcement officers involved in this investigation, and my knowledge of the investigation, I believe that, in the above exchange, SINGLETON told BROOKS that she ran out of "dope," meaning heroin, and that BROOKS agreed to replenish her supply.

52.     On or about March 3, 2022, at approximately 9:47 a.m. (TP1 Session 643), BROOKS, using Target Phone 1, called SINGLETON, using Singleton Phone 2. BROOKS stated, "I'm finna pull up.  Come to the front. I got you a [U/I]." SINGLETON responded, "Okay, let me grab some money right quick," and "I had put the money up. Let me grab it."  BROOKS stated, "Aight. Grab the money and come to the door."

53.     Beginning at approximately 9:50 a.m., law enforcement officials conducting surveillance through a CPD pod camera observed a four-door silver 2018 Volvo sedan registered to BROOKS arrive at the 1638 Mayfield Address ("Brooks Vehicle 4"). A short time later, SINGLETON departed from the front area of the building and met with the driver of Brooks Vehicle 4.  Based on my training and experience, and the training and experience of other law enforcement officers involved in this investigation, and observations made during surveillance, I believe that, in the above exchange:  (1) BROOKS told SINGLETON to come outside to turn in narcotics proceeds to BROOKS; and (2) SINGLETON met with BROOKS near the 1638 Mayfield Address to deliver money to him.

54.     On or about March 3, 2022, at approximately 10:26 a.m. (TP1 Session 658), BROOKS, using Target Phone 1, called SINGLETON, using Singleton Phone 2. BROOKS stated, "Alright, come to the door."  While talking to someone else in the background, SINGLETON stated, "Go to the door for me, Tommy [BIRT].  Grab that for me.  Alright."  BROOKS stated, "Yeah tell him to come out."

55.     Beginning at approximately 10:25 a.m., law enforcement officials conducting surveillance through a CPD pole camera and a CPD pod camera observed the following:

        a.      BROOKS exited the Mango Avenue Address and entered the driver's seat of Brooks Vehicle 4.

        b.      At approximately 10:29 a.m., Brooks Vehicle 4 arrived near the vicinity of the 1638 Mayfield Address.  BIRT walked to the driver's side window of Brooks Vehicle 4 and reached both of his arms into the car window.  BIRT then walked towards the 1638 Mayfield Address and Brooks Vehicle 4 departed the area.

56.     Based on my training and experience, and the training and experience of other law enforcement officers involved in this investigation, I believe that, in the above exchange:  (1) BROOKS called SINGLETON and asked her to come to the door to obtain a supply of narcotics; (2) SINGLETON told BIRT to go to the door and "grab that [the narcotics] for me"; and (3) BIRT retrieved the re-supply of suspected narcotics from BROOKS near the 1638 Mayfield Address.

**D. On or about March 4, 2022, CARLOS JAMES, ROSE, and WILLIAMS Distributed Narcotics to BROOKS, and BROOKS Re-Supplied SINGLETON with Narcotics**

57. Based on law enforcement surveillance and review of CPD pod camera footage, on or about March 4, 2022:

a. At approximately 8:38 a.m., CARLOS JAMES drove to the vicinity of 1743 Mayfield Avenue in a grey Infinity SUV bearing temporary registration P890699 ("James Vehicle 2")[28] and parked on the east side of the street.

b. At approximately 8:39 a.m., ROSE arrived in a black Lincoln sedan bearing registration 6654SS registered to ROSE ("Rose Vehicle 1") and parked near 1741 Mayfield Avenue.

c. CARLOS JAMES and ROSE both exited their vehicles and entered the front walkway of the 1742 Mayfield Address.

d. CARLOS JAMES carried a plastic grocery bag that appeared to be weighted with an object and a satchel bag.

58. On or about March 4, 2022, at approximately 2:55 p.m. (TP1 Session 980), BROOKS, using Target Phone 1, called XXX-XXX-7633, a phone used by

---

[28] According to the Indiana Department of Motor Vehicles, James Vehicle 2 is registered to a 1995 POL registered to KAG Merchant Gas Group LLC, 54354 Walnut Road, New Carlisle, IN 46552.

WILLIAMS (the "Williams Phone").[29]  BROOKS stated, "You ready?" WILLIAMS responded, "Yup, yup." BROOKS stated, "Ok, I'll be through there." BROOKS asked, "did you burn 'em [cook the crack cocaine]?" and WILLIAMS responded, "Yeah, yeah I burned."

59.     On or about March 4, 2022, at approximately 3:17 p.m. (TP1 Session 981), BROOKS, using Target Phone 1, received an incoming call from SINGLETON, using Singleton Phone 2.  SINGLETON stated, "I'm finished with the D [heroin]." BROOKS replied, "Okay," and "I'll be over there."

60.     Based on my training and experience, the training and experience of other law enforcement officers involved in this investigation, and my knowledge of the investigation, I believe that in the above exchange:  (1) SINGLETON told BROOKS that she was out of "D," a street term for heroin; and (2) BROOKS responded that he would meet SINGLETON to replenish her supply.

61.     On or about March 4, 2022, at approximately 3:18 p.m., ROSE exited 1742 Mayfield Avenue, entered his vehicle, and departed the area.

---

[29]     The identification of WILLIAMS, and WILLIAMS as the user of the Williams Phone, is based in part on the following:  (1) T-Mobile's records show that the account for the Williams Phone is registered to "Donald Williams" at 1644 North Mayfield Avenue, Chicago, IL 60639; (2) on or about March 6, 2022 (TP1 Sessions 1477, 1492), in intercepted wire communications over Target Phone 1, BROOKS referred to the user of the Williams Phone as "Donald," (3) on or about March 22, 2022, law enforcement officials conducting surveillance through a CPD pod camera observed BROOKS arrive in the vicinity of 1644 North Mayfield Avenue in Chicago, WILLIAMS's residence, shortly after phone calls between BROOKS and the user of the Williams Phone where BROOKS indicating that he intended to meet WILLIAMS; and (4) according to Commonwealth Edison's records, the account for 1644 Mayfield Avenue, Unit 2, in Chicago, Illinois, is registered to Donald Williams with telephone number 773-798-7633, the call number of the Williams Phone.

62.     On or about March 4, 2022, at approximately 3:48 p.m. (TP1 Session 985), BROOKS, using Target Phone 1, received an incoming call from SINGLETON, using Singleton Phone 2.   SINGLETON stated, "You ain't forgot about me?" BROOKS responded, "No, I'm waiting on them to finish."   BROOKS further stated, "I'm waiting on them now, they should be finishing up."

63.     Based on my training and experience, the training and experience of other law enforcement officers involved in this investigation, and my knowledge of the investigation, I believe that in the above exchange:  (1) SINGLETON asked BROOKS when she will receive a supply of narcotics; and (2) BROOKS responded that he's waiting for other members of the DTO, including CARLOS JAMES, to finish preparing the narcotics for distribution and to distribute the narcotics to him.

64.     On or about March 4, 2022, at approximately 4:09 p.m. (TP1 Session 990), BROOKS, using Target Phone 1, received an incoming call from CARLOS JAMES, using Target Phone 2.  CARLOS JAMES stated, "Where you at?"  BROOKS responded, "Right here in the neighborhood."  BROOKS further stated, "I'm in the neighborhood.  You waiting?"  CARLOS JAMES responded, "Yeah, come on you know [U/I]."

65.     Thereafter, beginning at approximately 4:10 p.m., law enforcement officials conducting surveillance through a CPD pole camera and CPD pod camera observed BROOKS exit the Mango Avenue Address and drive Brooks Vehicle 2 near the 1742 Mayfield Address.  BROOKS exited his vehicle and walked towards the front entrance of the 1742 Mayfield Address.

66.     At approximately 4:15 p.m. (TP1 Session 991), BROOKS, using Target Phone 1, called CARLOS JAMES, using Target Phone 2.   During the call, BROOKS stated, "Yeah," and CARLOS JAMES responded, "Aight, here I come."

67.     At approximately 4:26 p.m., law enforcement officials conducting surveillance through a CPD pod camera observed BROOKS and CARLOS JAMES exit the front entranceway of 1742 Mayfield Address. BROOKS carried a white reusable "ALDI" grocery bag that appeared to be weighted with an object and placed the bag in the rear passenger seat of Brooks Vehicle 2.  CARLOS JAMES then entered the driver's seat of James Vehicle 2 and departed the area.

68.     At approximately 4:28 p.m. (TP1 Session 998), BROOKS, using Target Phone 1, received a call from WILLIAMS, using the Williams Phone.  During the call, BROOKS stated, "Be there in a minute man, had to pick up something from Birdman [CARLOS JAMES]."[30]   WILLIAMS responded, "Ah, ah, checking on you." BROOKS stated, "You ready, you ready?"  WILLIAMS responded, "Yeah, I'm ready. Yeah, I'm ready."  BROOKS stated, "Okay. I'll be there in a few more minutes. Gotta take this stuff in the house."

---

[30]     Law enforcement officials identified "Birdman" as a nickname for CARLOS JAMES based in part on the following:  (1) law enforcement officials observed that, before this cal, BROOKS had recently met with CARLOS JAMES; (2) CARLOS JAMES has a public Instagram account with the username "Birdman.james." The Instagram account posted a video of an individual who law enforcement officials identified as CARLOS JAMES based on a comparison of the person in the video to CARLOS JAMES's driver's license photograph; (3) during intercepted communications of Target Phone 1 (TP1 Sessions 2792 and 2885), BROOKS addressed CARLOS JAMES, the user of Target Phone 2, as "Bird" and "Birdman"; and (4) Cook County Sheriff's Department records also associate CARLOS JAMES with the nickname "Bird Man."

69.     Based on my training and experience, the training and experience of other law enforcement officers involved in this investigation, my knowledge of the investigation, and observations made on surveillance, I believe that in the above exchange:  (1) BROOKS told WILLIAMS that he picked narcotics up from CARLOS JAMES; and (2) BROOKS planned to meet WILLIAMS after first stopping at BROOKS's residence, where WILLIAMS would supply BROOKS with crack cocaine.

70.     At approximately 4:30 p.m., law enforcement officials conducting surveillance through a CPD pole camera observed BROOKS return to the Mango Avenue Address and carry the "ALDI" bag inside.

71.     Law enforcement officials conducting surveillance through a CPD pod camera observed the following:

        a.      At approximately 5:13 p.m.,  BROOKS parked Brooks Vehicle 2 near the 1638 Mayfield Address.  BROOKS exited his vehicle and walked towards the entrance of 1644 North Mayfield Avenue.[31]

        b.      At approximately 5:17 p.m., BROOKS exited the building located at approximately 1644 North Mayfield Avenue and departed the area.  BROOKS did not appear to be carrying anything in his hands when he departed the premises.

72.     Based on my training and experience, and the training and experience of other law enforcement officers involved in this investigation, and observations

---

[31]     At approximately 5:14 p.m., BROOKS, using Target Phone 1, called WILLIAMS, using the Williams Phone (TP1 Sessions 1018 and 1019). The calls contained no discussions other than the background noise created from the line remaining open which appeared to be accidental.

made during surveillance, I believe that, on or about March 4, 2022, BROOKS met WILLIAMS near 1644 North Mayfield Avenue to obtain a supply of cocaine.

73.     On or about March 4, 2022, at approximately 5:13 p.m. (TP1 Session 1017), BROOKS, using Target Phone 1, called SINGLETON, using Singleton Phone 2.  BROOKS stated, "[U/I] to the door," and SINGLETON responded, "Alright."

74.     Based on my training and experience, the training and experience of other law enforcement officers involved in this investigation, my knowledge of the investigation, and observations made on surveillance, I believe that in the above exchange, BROOKS told SINGLETON that he was coming to meet SINGLETON.

75.     Law enforcement officials conducting surveillance through a CPD pole and pod camera observed the following:

    a.     At approximately 5:13 p.m., BROOKS parked Brooks Vehicle 2 near the 1638 Mayfield Address.  BROOKS exited his vehicle[32] and walked down the walkway towards the front entrance of 1638 Mayfield Address.

    b.     Shortly thereafter, BROOKS walked across the front lawns of the buildings located on that block towards the entrance of the 1644 Mayfield Address, the multi-unit building where WILLIAMS resides. At approximately 5:17 p.m., BROOKS exited the 1644 Mayfield Address and departed the area.  BROOKS did not appear to be carrying anything in his hands when he departed the premises.

---

[32]     From the vantage point of surveillance, law enforcement officials did not see BROOKS carry anything in his hands.  Law enforcement officials believe that BROOKS concealed narcotics in his clothing or inside pockets.

76.     Based on my training and experience, the training and experience of other law enforcement officers involved in this investigation, and observations made on surveillance, I believe that, BROOKS traveled to the 1638 Mayfield Address to deliver narcotics to SINGLETON and, after supplying SINGLETON with narcotics, BROOKS returned to WILLIAMS's residence to deliver narcotics proceeds to him.

### E.     On or About March 7, 2022, CANO Collected Narcotics Proceeds from BIRT and Re-Supplied BIRT with Narcotics

77.     On or about March 7, 2022, at approximately 5:45 p.m. (TP1 Session 1845), BROOKS, using Target Phone 1, spoke to CANO.[33]  During the call, BROOKS and CANO had the following exchange:

| | |
|---|---|
| BROOKS: | Tommy's [BIRT] on his way right gonna get you his money and give him two balls [jabs of heroin]. |
| CANO: | Okay. Are you, you're on your way to Humboldt Park, right? |
| BROOKS: | Yeah, I, on my way to ahh Highland now.  I'm almost there. |

78.     On or about March 7, 2022, commencing at approximately 5:26 p.m., law enforcement officials conducting surveillance through a CPD pole camera and a CPD pod camera observed the following:

---

[33]     The call direction and phone number of the person speaking to BROOKS were not registered by the FBI's system during this call.  According to toll records of Target Phone 1, BROOKS placed a call to the Cano Phone at approximately 5:45 p.m., the same approximate time as the recorded conversation described above.  In addition, law enforcement officials recognized the voice of the person who spoke to BROOKS as CANO's voice based on a comparison of that voice to the voice of the person who used the Cano Phone.

a.      BROOKS exited the Mango Avenue Address and departed in Brooks Vehicle 4.

b.      At approximately 5:56 p.m., BIRT and an unknown male exited the 1638 Mayfield Address and walked toward the Mango Avenue Address.

c.      At approximately 6:01 p.m., BIRT and the unknown male arrived at the Mango Avenue Address.  A short time later, BIRT departed the Mango Avenue Address and traveled towards the 1638 Mayfield Address.

d.      At approximately 6:12 p.m., BIRT returned to the 1638 Mayfield Address.

79.      Based on my training and experience, the training and experience of other law enforcement officers involved in this investigation, observations made on surveillance, and my knowledge of the investigation, I believe that in the above exchange:  (1) BROOKS informed CANO that BIRT would drop off narcotics proceeds to CANO; (2) BROOKS asked that CANO re-supply BIRT "two balls," meaning two jabs of heroin, and CANO agreed; and (3) BIRT traveled to the Mango Avenue Address and met CANO to provide narcotics proceeds and obtain the narcotics.

**F.      On or About March 8, 2022, the DTO Began Distributing a New Mix of Narcotics**

80.      On or about March 8, 2022, at approximately 3:41 p.m. (TP1 Session 2084), BROOKS, using Target Phone 1, called XXX-XXX-1897, a phone used by

KNIGHT (the "Knight Phone").[34]  During the call, BROOKS and KNIGHT had the following exchange:

| | |
|---|---|
| KNIGHT: | What's up, cap? |
| BROOKS: | How's the lick, man? |
| KNIGHT: | Hey, hey, it's decent as hell got. It's decent. |
| BROOKS: | [U/I] Alright. |
| KNIGHT: | Huh? |
| BROOKS: | It's alright? |
| KNIGHT: | Yeah, yeah it's alright. Everybody I told when I taste it yeah man you know what I mean. Shit. I ain't even gone lie [n-word], the shit we have is still the bomb. |
| BROOKS: | Yeah, but [U/I] . . . . |
| KNIGHT: | Yeah. |
| BROOKS: | What about, what about the size of the bag? |
| KNIGHT: | Oh yeah, yeah yeah. That right there, that takes over the top too and motherfuckers could still buy one of them. tear you a half. To work and  be cool to the half a day. Like the old shit. [U/I] do half.  Do the other half when you get off. So . . . . |
| BROOKS: | Right. |

---

[34]    The identification of KNIGHT as the user of the Knight Phone is based in part on the following:  (1) according to T-Mobile's records, the Knight Phone is subscribed to KNIGHT; and (2) BROOKS referred to the user of Knight Phone as "Avis."

| | |
|---|---|
| KNIGHT: | Long. Long as it do that. [N-word] get that all day long. |
| BROOKS: | Alright. |
| KNIGHT: | Yeah, but it's cool, man. Ah, I got three. |

81.     Based on my training and experience, the training and experience of other law enforcement officers involved in this investigation, observations made on surveillance, and my knowledge of the investigation, I believe that in the above exchange:  (1) BROOKS asked KNIGHT for his opinion of the "new lick," meaning a new narcotics combination sold by the DTO; (2) KNIGHT responded that it's "decent," meaning that the substance was of a good quality; (3) KNIGHT stated, "the shit we have is still the bomb," meaning that KNIGHT believed the new narcotics are of a good quality, but that the narcotics distributed by the DTO previously were also of a good quality; (4) when discussing the size of the bag of narcotics, KNIGHT stated that the customer could still buy one bag and split the amount in half to use throughout the day; and (5) KNIGHT had "three," meaning KNIGHT had three blows or jabs of heroin left to sell to customers.

82.     A short time later, at approximately 5:11 p.m. (TP1 Session 2104), BROOKS, using Target Phone 1, received a call from XXX-XXX-7678, a phone used by an unknown narcotics customer (UM-7678).  During the call, BROOKS and UM-7878 had the following exchange:

| | |
|---|---|
| UM-7678: | Yeah, man you got two soft or what? |
| BROOKS: | Yeah, I got two soft. We don't have no two for ten [two bags for $10] no more. We don't have no uh uh sets no more. |

| UM-7678: | You what? |
| BROOKS: | I don't have the sets no more, I got big bags. |
| UM-7678: | What you got? |
| BROOKS: | One big bag. |
| UM-7678: | That's what y'all doing, alright, alright. |
| BROOKS: | We got some new shit. |

83.     Based on my training and experience, the training and experience of other law enforcement officers involved in this investigation, and my knowledge of the investigation, I believe that in the above exchange: (1) UM-7678, a narcotics customer, asked BROOKS for "two soft," referring to two blows of heroin; (2) BROOKS stated that he no longer sells two-bag blows of heroin for $10 but rather sells one bigger bag for $10; and (3) BROOKS further stated, "we got some new shit," meaning that BROOKS is selling a new heroin product.

84.     On or about March 8, 2022, at approximately 6:39 p.m. (TP1 Session 2122), BROOKS, using Target Phone 1, received a call from BIRT, using the Birt Phone. BIRT stated, "tell 'Los' [CARLOS JAMES] that he gonna [U/I] put some tape on them or staple it [the blows of heroin]." BROOKS asked why, and BIRT responded, "You know, on the, on the new one cause they [U/I] man. You know CC [SINGLETON] mad the motherfucker easy to open. I mean waste."

85.     Based on my training and experience, the training and experience of other law enforcement officers involved in this investigation, and my knowledge of

44

the investigation, I believe that in the above exchange, BIRT asked that BROOKS tell "Los," referring to CARLOS JAMES, to tape or staple the new bags closed because SINGLETON believed that they could open easily and cause a waste of narcotics.

86.     On or about March 10, 2022, at approximately 8:46 a.m. (TP1 Session 2417), BROOKS, using Target Phone 1, made an outgoing call to CARLOS JAMES, using Target Phone 2. During this call, BROOKS stated, "I need you, man." CARLOS JAMES responded, "Ah, we gonna do 'em two for ten back." BROOKS responded, "Okay, alright. That'll work." Based on my training and experience, the training and experience of other law enforcement officers involved in this investigation, and my knowledge of the investigation, I believe that in the above exchange: (1) CARLOS JAMES told BROOKS that the DTO would return to the practice of selling two-bag blows of heroin for $10; and (2) BROOKS responded affirmatively.

### G.     On or about March 11, 2022, BROOKS and CANO Distributed Narcotics Proceeds to VASHON JAMES

87.     On or about March 5, 2022, at approximately 9:13 a.m. (TP1 Session 1127), BROOKS, using Target Phone 1, called VASHON JAMES, using the Vashon James Phone. During the call, BROOKS and VASHON JAMES discussed money that BROOKS owed to VASHON JAMES. BROOKS stated, "Pooch, I'm not gonna fall out with you over dope money, man. If I owe you $100, I'll give you $100, man."

88.     Based on my training and experience, the training and experience of other law enforcement officers involved in this investigation, and my knowledge of the investigation, I believe that in the above exchange, BROOKS and VASHON

JAMES discussed the amount of money that BROOKS owed VASHON JAMES for narcotics.

89.     On or about March 11, 2022, at approximately 10:03 a.m. (TP1 Session 2650), BROOKS, using Target Phone 1, called VASHON JAMES, using the Vashon James Phone.  BROOKS stated, "Come get ya paper [money]."  VASHON JAMES responded, "Alright, 'bout an hour."

90.     On or about March 11, 2022 at approximately 11:20 a.m. (TP1 Session 2668), BROOKS, using Target Phone 1, received an incoming call from VASHON JAMES, using the Vashon James Phone.  VASHON JAMES stated, "Yo your lady [CANO] at the crib [Mango Avenue Apartment]?  I know you ain't there."  BROOKS stated, "Wait [U/I].  I'mma call and tell her [CANO] to give you the money."  Based on my training and experience, the training and experience of other law enforcement officers involved in this investigation, and my knowledge of the investigation, I believe that in the exchanges described in paragraphs 87 through 89 above, BROOKS told VASHON JAMES to collect narcotics proceeds from CANO at the Mango Avenue Apartment.

91.     On or about March 11, 2022 at approximately 11:21 a.m. (TP1 Session 2669, BROOKS, using Target Phone 1, call the Cano Phone, used by CANO.  During the call, BROOKS and CANO had the following exchange:

| BROOKS: | Go in our bedroom. Look on the dresser, get that money and give it to Pooch [VASHON JAMES]. |
| CANO: | Go in the bedroom, go in the bedroom, and what? |

| | |
|---|---|
| BROOKS: | See the money on the dresser? |
| CANO: | Look on the dresser ,]uh huh. |
| BROOKS: | See the money on the dresser? |
| CANO: | Yes, there's money on the dresser. |
| BROOKS: | Give that to Pooch [VASHON JAMES]. It should be $500. |
| CANO: | The ones with the singles and rolled up? |
| BROOKS: | Yeah [U/I]. |

    \*     \*     \*     \*

| | |
|---|---|
| BROOKS: | Yeah, put it in the bag. |
| CANO: | What the fuck? Oh. I thought I, dope came out the bag. It's me I put my shit upside down. Oh my god. |
| BROOKS: | What happened? |
| CANO: | Ready to go. You there? Baby, you still there? |
| BROOKS: | Yeah. |
| CANO: | Did you say he's [VASHON JAMES] there? |
| BROOKS: | Nah, when doorbell he'll be there. |

92.    At approximately 11:24 a.m. (TP1 Session 2672), BROOKS, using Target Phone 1, called CANO, using the Cano Phone. BROOKS stated, "At the door." CANO responded, "Oh, he's at the door? [U/I]." BROOKS stated, "You told me to call you." CANO responded, "Yeah, I know when I'm going back to get the money." At

the completion of the call, CANO stated, "Alright. Mission completed." BROOKS responded, "Ok, thank you."

93. At approximately 11:24 a.m., law enforcement officials conducting surveillance through a CPD pole camera observed VASHON JAMES arrive at the Mango Avenue Address and enter the building. At approximately 11:27 a.m., VASHON JAMES drove away from the Mango Avenue Address in a light blue Chrysler van with registration CQ33505 that is registered to CARLOS JAMES.

94. Based on my training and experience, the training and experience of other law enforcement officers involved in this investigation, and my knowledge of the investigation, I believe that, in the exchanges described in paragraphs 87 through 94 above: (1) BROOKS and VASHON JAMES discussed the amount of money that BROOKS owed VASHON JAMES for the narcotics he distributed to BROOKS; (2) BROOKS instructed that CANO retrieve narcotics proceeds from their bedroom and give it to VASHON JAMES; and (3) VASHON JAMES collected the narcotics proceeds from CANO at the Mango Avenue Apartment.

### H. On or about March 21, 2022, BROOKS and CARLOS JAMES Discussed the Narcotics Sales Performance of DTO Members

95. On or about March 21, 2022, BROOKS, using Target Phone 1, received a call from CARLOS JAMES, using Target Phone 2.[35] BROOKS and CARLOS JAMES had an approximately 45-minute conversation where, based on my training and experience and knowledge of the investigation, CARLOS JAMES chastised

---

[35] The call occurred over Target Phone 1 Sessions 4723 through 4735.

BROOKS for not selling a sufficient quantity of narcotics. During one portion of the

calls (TP1 Session 4724), BROOKS and CARLOS JAMES had the following exchange:

| | |
|---|---|
| CARLOS JAMES: | I said, man, that motherfucker got me lost, man. |
| BROOKS | Who? |
| CARLOS JAMES: | I'm talking 'bout up down, shit. |
| BROOKS: | What you mean? |
| CARLOS JAMES: | Like, we flying through that same what ya'll, what we got up there. I don't know what the fuck going on up there, man. |
| BROOKS: | That's why I ain't got no money, man. |
| CARLOS JAMES: | Every mother fucking month around this time I been noticing it get to doing that up there. |
| BROOKS: | I know. I know. |
| CARLOS JAMES: | And what they what Tommy [BIRT] and them been doing today? |
| BROOKS: | They regular work. One or two. |
| CARLOS JAMES: | What, I'm saying, what you been doing, son? |
| BROOKS: | I been doing three, four. Some days some days I do three. Some days I do four. I'm out here, man. If the people call I'm out here, man. But they ain't nobody calling, man. [U/I]. Ain't nobody calling, man. When they call I go. |
| CARLOS JAMES: | So your pack buyers ain't been calling the shit either? |

| | |
|---|---|
| BROOKS: | Nope. Not really. Nope. |
| CARLOS JAMES: | That's crazy. So your phone, so your phone the one dropped? Tommy [BIRT] and them still doing the same thing they been doing. |
| BROOKS: | Right. [talking in the background]. |
| CARLOS JAMES: | You say what? |
| BROOKS: | [talking in the background] |
| CARLOS JAMES: | What you say, Sam? |
| BROOKS: | I say, like uh, okay, uh, Lil' Dave [LAMB] is fucking up. I have to make his money right. He doing what like one ball [a jab of heroin] a day. |
| CARLOS JAMES: | Who, Lil' Dave [LAMB]? |
| BROOKS: | Yup. I'm trying. I'm locked in, man. But we go through this little phases. [U/I] Like one minute he [LAMB] be doing like two or three of balls [jabs] a day and then they drop down to one a day. And then he fuck up and short my ball [jab] right there. |
| CARLOS JAMES: | What Avis [KNIGHT] been doing? |
| BROOKS: | Two. Avis [KNIGHT] been doing two. |
| CARLOS JAMES: | Nah, what I'm starting to see it's your phone. Everybody else just still doing the same shit. I was talking to Tommy [BIRT] and he was like, shit, I'm doing the same thing I been doing. Then you just said, Tommy [BIRT] been doing the same shit  he been doing. That's your shit. That's your phone. |

96.     Based on my training and experience, the training and experience of other law enforcement officers involved in this investigation, and my knowledge of the investigation, I believe that in the above exchange: (1) CARLOS JAMES believed that narcotics sales in the areas serviced by BROOKS were slipping; (2) CARLOS JAMES asked BROOKS what quantity of narcotics other DTO members, including LAMB ("Lil' Dave"),[36] BIRT ("Tommy"), and KNIGHT ("Avis") sell, and BROOKS responded that LAMB sells approximately one jab per day, BIRT sells approximately one or two jabs of heroin a day, and KNIGHT sells approximately two jabs of heroin a day; (3) BROOKS told CARLOS JAMES that BROOKS sells between three and four jabs of heroin a day; and (4) CARLOS JAMES opined that BROOKS's phone "dropped," meaning that fewer customers are calling BROOKS to purchase narcotics, and BROOKS is the reason for the DTO's reduction in sales.

97.     As the conversation continued, during another portion of the call (TP1 Session 4724), BROOKS and CARLOS JAMES had the following exchange:

| | |
|---|---|
| BROOKS: | Okay look. Let me explain something to you, bro. I'll give them a ball. Give him and CC a ball. Okay [U/I] And straight up day is over with, Tommy [BIRT] will turn his in [U/I]. Same thing with Lil' Dave. [U/I] Okay he brought me what? He brought me $60 this morning. I had to put the four [$40] in for him. Keep on rolling, you know. It's stupid shit, man. |
| CARLOS JAMES: | That was only that was only 28 we gave you. And three of them was yours. |

---

[36]     As described in paragraph 28 above, on or about January 4, 2022, while CS-2 waited in the Brooks Apartment to conduct a heroin transaction with BROOKS, CANO referred to LAMB as "Little Dave" when she asked that LAMB give CS-2 a blow of heroin.

| | |
|---|---|
| BROOKS: | [U/I]. |
| CARLOS JAMES: | Yeah, I gave it to you 7 in the afternoon. |
| BROOKS: | Right. |
| CARLOS JAMES: | Like around 7 o'clock. Cause I was getting ready to go to that concert. It was like 7 o'clock. |
| BROOKS: | Yup. |
| CARLOS JAMES: | So you really started, you really started on that mother fucker Sunday. |
| BROOKS: | Yup. |
| CARLOS JAMES: | Yeah, that shit. So what Teddy been on. |
| BROOKS: | Who? |
| CARLOS JAMES: | Teddy. Teddy. |
| BROOKS: | Teddy just got started. I put him done in my phone and he been doing a ball a day. He just started. And he getting his people back down like he was before. Teddy gonna be alright. |
| CARLOS JAMES: | Yeah, I had a long talk with him. |
| BROOKS: | Oh, before I put him on? |
| CARLOS JAMES: | Yeah. |
| BROOKS: | Okay. |
| CARLOS JAMES: | So you got Teddy, Tommy [BIRT], CC [SINGLETON], Lil' Dave [LAMB] and Avis [KNIGHT]? |
| BROOKS: | Yup. |

> CARLOS JAMES:  And all of them, see, this what this the shit that be making my antennas way up. All of them, between five of them, make you make six, that shit supposed to be flying, man.

98.     Based on my training and experience, the training and experience of other law enforcement officers involved in this investigation, and my knowledge of the investigation, I believe that in the above exchange: (1) BROOKS told CARLOS JAMES that he gives BIRT ("Tommy"), SINGLETON ("CC"), and LAMB ("Lil' Dave") "a ball," meaning one jab of heroin, each day to distribute; (2) CARLOS JAMES responded that was "only 28 we gave you, and three of them was yours," meaning that CARLOS JAMES supplied BROOKS with 28 jabs of heroin, and, from that supply, BROOKS may keep three jabs to sell for his personal profit; (3) CARLOS JAMES stated that BROOKS "started on the mother fucker Sunday," meaning that BROOKS received a supply of narcotics on Sunday; (4) CARLOS JAMES asked how Teddy, a new DTO member, is doing, and BROOKS responded that Teddy distributes one jab of heroin a day and will be fine; (5) CARLOS JAMES stated he had a long talk with "Teddy" before he started working with BROOKS to distribute narcotics; (6) BROOKS identified the DTO members that BROOKS supplies with narcotics as "Teddy," BIRT ("Tommy"), SINGLETON ("CC"), LAMB ("Lil' Dave"), and KNIGHT ("Avis"); and (7) CARLOS JAMES opined that, between BROOKS and the five additional DTO members, they should be selling large quantities of narcotics.

99.     As the conversation continued, during another portion of the call (TP1 Session 4724), BROOKS and CARLOS JAMES had the following exchange:

53

CARLOS JAMES:        If all them slipping the same way they been slipping, Sam, you telling me your phone ain't doing shit no more.

BROOKS:        I'm not telling you that, Carlos.

CARLOS JAMES:        Yes, you is cause it's not adding up. Then you just sitting here and telling me, then you just sitting here and telling me that you been doing three mother fucking jabs. When your phone start doing three jabs?

BROOKS:        They just ain't been calling like they normally call, man. I'm out here. I'm double-breasted [selling heroin and crack cocaine], man. I'm out here double-breasted. I haven't even been selling no C [crack cocaine] like I was.

CARLOS JAMES:        And you don't know why? You don't know why your phone just dropped down to three mother fucking jabs? You ain't telling me shit. The shit just pissing me off more and more as we sit here and talk.

BROOKS:        If you want to blame me, blame me, man. I don't know, man. I'm out here, man. I'm out here. I'm out here. I answer all calls, man. I go wherever there is to make money, man. I don't know what to tell you, man. I don't know what you want to hear from me, man. I'm telling you what I'm telling you. I not pulling no stops. I'm not doing none of that, man. I'm out here, man.

CARLOS JAMES:        I'm just tryna see why your shit dropped down the three jabs. That shit sound unreal.

54

| | |
|---|---|
| BROOKS: | My phone done dropped down and then, man. |
| CARLOS JAMES: | You say what? |
| BROOKS: | I said, my phone my phone be dropping. Be dropping up and down and then [U/I] Carlos, man, listen. Just put it all on me. Just put it on me and my fault. I'm out here as quick as I can to you, man. I don't bring you no short money. I bring you what I'm supposed to bring you, man. I make sure your money right. I been doing that since day one. |
| CARLOS JAMES: | I'm just tryna see how the fuck it dropped down like that. But I'm sitting up here giving the same shit to other mother fuckers and they flying through this shit. Three to four jabs. So you telling me you doing what they doing now. |

100. Based on my training and experience, the training and experience of other law enforcement officers involved in this investigation, and my knowledge of the investigation, I believe that in the above exchange: (1) CARLOS JAMES complained that BROOKS's narcotics sales dropped to three jabs of heroin a day; (2) BROOKS told CARLOS JAMES that he is working to distribute narcotics and is "double-breasted," meaning that he sells two types of narcotics, specifically heroin and crack cocaine; (3) BROOKS stated that, in addition to selling less heroin, he is selling less "C," meaning crack cocaine; (4) BROOKS stated that he doesn't bring CARLOS JAMES "short money," meaning that BROOKS pays CARLOS JAMES what he owes him for the narcotics; and (5) CARLOS JAMES said that other people he supplies in the DTO are selling narcotics more quickly.

55

101.    As the conversation continued, during another portion of the call (TP1 Session 4726), BROOKS and CARLOS JAMES had the following exchange:

| | |
|---|---|
| CARLOS JAMES: | So how many people, how many people you got that be buying balls? |
| BROOKS: | I got, I got, I got the Latino and I got ahh Roosevelt, on Huron down the street from where you used to stay. He buy balls. Uh, who else get balls? |
| CARLOS JAMES: | So in the morning time I'm a need all they numbers, Sam. I'm a need all they numbers so I can call them. Cause I need to see what the fuck going on, man. |
| BROOKS: | Aight. |
| CARLOS JAMES: | I need to call them and ask them why they not calling you. |

102.    Based on my training and experience, the training and experience of other law enforcement officers involved in this investigation, and my knowledge of the investigation, I believe that in the above exchange:  (1) CARLOS JAMES told BROOKS that he is upset that customers who buy jabs of heroin (a larger quantity of narcotics) are not placing orders with BROOKS; and (2) CARLOS JAMES asked for the telephone numbers of BROOKS's bigger customers so CARLOS JAMES can ask them why they are not buying narcotics from BROOKS.[37]

---

[37]    Intercepted communications from Target Phone 1, used by BROOKS, do not reflect that BROOKS gave CARLOS JAMES the phone numbers of BROOKS's narcotics customers. The next day, BROOKS had another conversation with CARLOS JAMES, who indicated to BROOKS that he overreacted and had been confused about when BROOKS received the last supply of narcotics.

## I. BROOKS Spoke to LAMB, KNIGHT, SINGLETON, and BIRT About Their Narcotics Sales

103.    On or about March 25, 2022, at approximately 9:14 a.m. (TP1 Session 5763), BROOKS, using Target Phone 1, called XXX-XXX-7102, a telephone used by LAMB (the "Lamb Phone").[38]  During the call, BROOKS and LAMB had the following exchange:

| | |
|---|---|
| LAMB: | What's up, big bro? I'm up, man. I'm just getting up. I got five [blows]. |
| BROOKS: | Okay, try to get rid of those. Cause I gotta turn the money in this morning. |
| LAMB: | Aight. |

104.    On or about March 25, 2022, at approximately 9:15 a.m. (TP1 Session 5765), using Target Phone 1, called KNIGHT, using the Knight Phone.  During the call, BROOKS and KNIGHT had the following exchange:

| | |
|---|---|
| BROOKS: | What you got left? |
| KNIGHT: | Shit, eight. I ain't do nothing last night, man. After I came in, I ate man I passed out. |
| BROOKS: | Okay, I figured that. |
| KNIGHT: | Yeah, I'm out here now thought. |

---

[38]    The identification of LAMB, and LAMB as the user of the Lamb Phone, is based in part on the following:  (1) BROOKS referred to the user of the Lamb Phone as "Dave" in multiple wire interceptions of Target Phone 1, including TP1 Sessions 1175, 2136, 2319, and 2599; and (2) on or about March 18, 2022, the user of the Lamb Phone stated to BROOKS, "I'm at your door," (TP1 Session 4092).  Through a CPD pole camera, law enforcement officials observed LAMB on pole camera at the front entrance of the Mango Avenue Address. Law enforcement officials recognized that person as LAMB based on his CPD arrest photograph. Shortly thereafter, BROOKS then placed an outgoing call to CANO (TP1 Session 4103) to tell her to let "Lil Dave" [LAMB] into the residence.

| BROOKS: | So you full? |
| KNIGHT: | Yeah, I'm straight. |
| BROOKS: | Okay, nah. I gotta run the money in this morning. |

105.    Based on my training and experience, the training and experience of other law enforcement officers involved in this investigation, and my knowledge of the investigation, I believe that in the above exchange: (1) BROOKS asked KNIGHT how much heroin and crack cocaine KNIGHT had left to sell; (2) KNIGHT responded, "eight," meaning that KNIGHT had eight blows of heroin left to distribute; and (3) BROOKS stated, "I gotta run the money in this morning," meaning BROOKS had to turn in narcotics proceeds to CARLOS JAMES or another DTO member.

106.    On or about March 25, 2022, at approximately 3:12 p.m. (TP1 Session 5594), BROOKS, using Target Phone 1, received a call from KNIGHT, using the Knight Phone.   During the call, KNIGHT asked, "It's safe to go by?"   BROOKS responded, "Yeah," and "I'm headed to the house. You'll probably get there before me, so let me call her [CANO]."

107.    Based on my training and experience, the training and experience of other law enforcement officers involved in this investigation, and my knowledge of the investigation, I believe that in the above exchange:  (1) KNIGHT asked whether it was safe for him to go to the Mango Avenue Address to be re-supplied with narcotics; and (2) BROOKS responded affirmatively, stating that he would call "her," meaning CANO, to let her know that KNIGHT was on his way.

58

108. On or about March 25, 2022, at approximately 3:13 p.m. (TP1 Session 5596), BROOKS using, Target Phone 1, called CANO, using the Cano Phone. During the call, BROOKS stated, "I'm sorry to call you, but I'm coming from Harlem. Avis [KNIGHT] is calling he want to reload." CANO responded, "Okay."

109. Based my training and experience, the training and experience of other law enforcement officers involved in this investigation, and my knowledge of the investigation, I believe that in the above exchange: (1) BROOKS told CANO that KNIGHT wanted a re-supply of narcotics; and (2) CANO responded, "Okay."

110. That same day, law enforcement officials conducting surveillance of the Mango Avenue Address through a CPD pole camera observed the following:

a. At approximately 3:19 p.m., KNIGHT arrived at the front entrance of the Mango Avenue Address, placed his bicycle on the porch, and entered the building.[39]

b. At approximately 3:24 p.m., KNIGHT exited the Mango Avenue address and began to depart on his bicycle. As KNIGHT started to leave the area, BROOKS arrived at the Mango Avenue Address and engaged in conversation with KNIGHT.

c. KNIGHT then left the area and BROOKS entered the Mango Avenue Address.

111. Based my training and experience, the training and experience of other law enforcement officers involved in this investigation, and my knowledge of the

---

[39] Law enforcement officials identified KNIGHT through a CPD booking photograph.

investigation, I believe that, on or about March 25, 2022, KNIGHT traveled to the Mango Avenue Address and obtained a re-supply of narcotics from CANO.

112. On or about March 28, 2022, at approximately 7:59 a.m. (TP1 Session 6358), BROOKS, using Target Phone 1, called LAMB, using the Lamb Phone. During the call, BROOKS and LAMB had the following exchange:

| | |
|---|---|
| BROOKS: | What you got left? |
| LAMB: | Whoa, I got um, real talk I got damn it ah six C bucks [crack cocaine] and I got damn it ah four blows [heroin] |
| BROOKS: | Aight. |
| LAMB: | I'm supposed to turn in 120 all together though really. |
| BROOKS: | I know. |
| LAMB: | With both of them. Alright then. |

113. Based my training and experience, the training and experience of other law enforcement officers involved in this investigation, and my knowledge of the investigation, I believe that in the above exchange: (1) BROOKS stated, "What you got left," meaning how much heroin and crack cocaine do you have left to sell; and (2) LAMB's response that he had "six 'C' bucks" and "four blows," meant that LAMB had six individual servings, or ten dollar bags, of crack cocaine and four blows of heroin.

114. On or about March 28, 2022, BROOKS, at approximately 8:00 a.m. (TP1 Session 6359), BROOKS, using Target Phone 1, called KNIGHT, using the Knight Phone. During the call, BROOKS and KNIGHT had the following exchange:

| | |
|---|---|
| BROOKS: | What's up, man? |

| | |
|---|---|
| KNIGHT: | Aye, I got uh, I got one more to go, man and I'm a bring you 13 back. I mean you now later on I'll be 13 dollars short. |
| BROOKS: | Aight. |
| KNIGHT: | I got one to go now that mean I'll have ahhh 87, I'll have 87 dollars. |
| BROOKS: | Aight. |

115. Based my training and experience, the training and experience of other law enforcement officers involved in this investigation, and my knowledge of the investigation, I believe that in the above exchange: (1) KNIGHT stated, "I got one to go now," meant one blow of heroin to sell; and (2) KNIGHT stated, "I'll be 13 dollars short" and "I'll have 87 dollars," meaning that KNIGHT does not have all the money he owes BROOKS for narcotics sales and will be $13 short.

116. On or about March 28, 2022, at approximately 8:02 a.m. (TP1 Session 6362), BROOKS, using Target Phone 1, called BIRT, using the Birt Phone. SINGLETON answered the call. During the call, BROOKS, BIRT, and SINGLETON had the following exchange:

| | |
|---|---|
| SINGLETON: | Ahhh I got um I got four Ds [blows of heroin] left and I did alright little with the C [crack cocaine], I got like five left. |
| BROOKS: | Okay. |
| BROOKS: | Tommy [BIRT] up? |
| SINGLETON: | Ahh, yeah. |
| BROOKS: | He up, let me talk to him. |
| BIRT: | Hello, hello. |

| | |
|---|---|
| BROOKS: | What's up, man? |
| BIRT: | I got like six Ds [blows of heroin]. |
| BROOKS: | What's you do yesterday? |
| BIRT: | Shit [U/I] was slow, shit. |
| BROOKS: | Aight, come on. I need you to get rid of it all. |
| BIRT: | Okay, we will. |

117. Based my training and experience, the training and experience of other law enforcement officers involved in this investigation, and my knowledge of the investigation, I believe that in the above exchange: (1) SINGLETON stated, "I got four Ds left" and I "did alright little with the C, I got like five left," meaning SINGLETON needed to sell four additional blows of heroin and five individual user quantities of crack cocaine to exhaust her supply of narcotics; (2) BIRT stated, "I got like six Ds," meaning BIRT had a supply of six blows of heroin; and (3) BROOKS stated, "I need you to get rid of it all," meaning BIRT and SINGLETON needed to sell their narcotics supply to street customers to maintain the DTO's sales.

### J. BROOKS, CARLOS JAMES, DONALD WILLIAMS, and VASHON JAMES Discussed the Manufacture and Distribution of Crack Cocaine

118. On or about March 25, 2022, at approximately 9:37 a.m. (TP1 Session 5462), BROOKS, using Target Phone 1, received a call from CARLOS JAMES, using Target Phone 2. During the call, BROOKS and CARLOS JAMES had the following exchange:

| | |
|---|---|
| CARLOS JAMES: | I was up to Trump [WILLIAMS's] crib yesterday. Fucking with him. |
| BROOKS: | Uh huh. He back on that bullshit, man. |
| CARLOS JAMES: | What he doing? |
| BROOKS: | On small ass bags, man. I'm steady having to keep telling him about the same shit, man. Shit crazy, man. |
| CARLOS JAMES: | I'm giving him over enough shit [narcotics] them motherfuckers should not be small, man. |
| BROOKS: | That's what I'm, I know this already. That's why I'm asking what the fuck is the problem. I know this already. I know what you giving him. |
| CARLOS JAMES: | That shit crazy, man. They gone keep playing and I'mma take over all that shit, man. |

119.    Based on my training and experience, the training and experience of other law enforcement officers involved in this investigation, and my knowledge of the investigation, I believe that in the above exchange: (1) BROOKS told CARLOS JAMES that WILLIAMS is preparing small bags of narcotics to sell to customers; (2) CARLOS JAMES stated that he is giving WILLIAMS enough "shit," meaning narcotics, and the bags should not be small; and (3) CARLOS JAMES stated that if they keep "playing," he's "gonna take over all that shit," meaning he will take over the preparation and packaging of the narcotics.

120.    On or about March 27, 2022, at approximately 8:49 p.m. (TP1 Session 6301), BROOKS, using Target Phone 1, received an incoming call from VASHON

JAMES, using the Vashon James Phone. During the call, BROOKS and VASHON

JAMES had the following exchange:

| | |
|---|---|
| BROOKS: | Yeah. |
| VASHON JAMES: | Yeah? What's wrong? |
| BROOKS: | Come get your package, dog, and hurry up. |
| VASHON JAMES: | Aight, aight [U/I]. |
| BROOKS: | Everybody complaining there's too much soda on there. |
| VASHON JAMES: | You got, you got the you got the fresh joint right here. |
| BROOKS: | Okay, alright come on. Come on with it. |
| VASHON JAMES: | I'm, it's gonna be in the morning. |
| BROOKS: | Oh fuck. |
| VASHON JAMES: | I mean I could come tonight. I'm on my way. |
| BROOKS: | Okay, come on, man, cause I need it. |

121.    Based my training and experience, the training and experience of other

law enforcement officers involved in this investigation, and my knowledge of the

investigation, I believe that in the above exchange: (1) BROOKS stated, "come get

your package, dog, and hurry up," meaning BROOKS needs VASHON JAMES to

collect his narcotics proceeds; (2) BROOKS stated, "everybody complaining there's too

much soda on there," meaning that the crack cocaine does not taste good to customers

because it is being mixed with too much baking soda; (3) VASHON agreed to meet

BROOKS that evening; and (4) BROOKS remarked, "Okay, come on, man, cause I

need it," meaning BROOKS needs VASHON JAMES to re-supply him with crack cocaine in exchange for narcotics proceeds.

122.    On or about April 14, 2022, at approximately 10:10 a.m. (TP2 Session 532), CARLOS JAMES, using Target Phone 2, called WILLIAMS, using the Williams Phone. During the call, CARLOS JAMES and WILLIAMS had the following exchange:

| | |
|---|---|
| CARLOS JAMES: | What's the word, Trump [WILLIAMS]? I was trying to call you back last night. |
| WILLIAMS: | Ah yeah. It's was all good, Joe. Hey, look right, blood told I got them wrong I putting little bags out there right. |
| CARLOS JAMES: | Who?  Sam [BROOKS]? |
| WILLIAMS: | Sam [BROOKS]. |
| CARLOS JAMES: | Yeah. |
| WILLIAMS: | Now I'm trying tell the man, right cause I be straight dropping my shit. I don't even hit my shit at all though, you get what I'm saying? |
| CARLOS JAMES: | Yeah I was right there with him. I was right there with him when dude called, he said that the um ... Sam was coming to get up with me when dude was on the phone. Dude was like the C [crack cocaine] good as hell. |
| WILLIAMS: | It was just kinda small? |
| CARLOS JAMES: | Yeah, I looked at a few of them, they... |
| WILLIAMS: | They was kinda small? |

| | |
|---|---|
| CARLOS JAMES: | You know all of them all of 'em ain't gonna be big, Joe, like I told Sam [BROOKS] shit. |
| WILLIAMS: | Right but, tell me honestly though, was they like too small though? |
| CARLOS JAMES: | Yeah, yeah. |

123. Based on my training and experience, and the training and experience of other law enforcement officers involved in this investigation, and observations made on surveillance, I believe that in the above exchange: (1) WILLIAMS told CARLOS JAMES that "Sam," referring to BROOKS, stated that WILLIAMS was "putting little bags out there," a reference to packaging smaller bags of crack cocaine for distribution; (2) WILLIAMS stated, "I don't even hit my shit at all though," meaning that WILLIAMS does not put cutting agents in the narcotics; (3) CARLOS JAMES stated that "dude," referring to a narcotics customer, called and said that the "C good as hell," meaning that the "C," a street term for crack cocaine, was of high quality; (4) CARLOS JAMES told WILLIAMS that he looked at some of the bags of crack cocaine that WILLIAMS prepared and believed that some of them were too small; and (5) CARLOS JAMES commented that not all of the baggies of crack cocaine will be large.

124. As the conversation continued, during another portion of the call, CARLOS JAMES and WILLIAMS had the following exchange:

| | |
|---|---|
| WILLIAMS: | I've been trying to make it work. Like I don't be trying to like, I'm trying to make the bags stretch. What am I gonna make an extra hundred dollars? I ain't trying to do that you feel me? |

CARLOS JAMES: Right, right.

125. Based on my training and experience, and the training and experience of other law enforcement officers involved in this investigation, and observations made during surveillance, I believe that in the above exchange, WILLIAMS told CARLOS JAMES that he did not intentionally shrink the size of the bags of narcotics.

## VI. CARLOS JAMES and VASHON JAMES Discussed Search Warrants Executed at the 1742 Mayfield Address and the Need to Move the DTO's Operations

126. On or about April 24, 2022, based in part on information that law enforcement officials obtained through wire interceptions of Target Phone 2, used by CARLOS JAMES, Magistrate Judge Beth W. Jantz authorized residential search warrants for 1742 Mayfield Avenue, second floor apartment ("Individual D Residence") and 1742 Mayfield Avenue, BSMT Apartment ("Individual E Residence"). On or about April 25, 2022, at approximately 6:08 a.m., law enforcement officials executed the search warrants and seized firearms from each residence.

127. On or about April 25, 2022, at approximately 7:44 a.m. (TP2 Session 941), CARLOS JAMES, using Target Phone 2, called VASHON JAMES, using the Vashon James Phone. During the call, CARLOS JAMES and VASHON JAMES had the following exchange:

CARLOS JAMES: Boy they just hit that building

VASHON JAMES: What building?

CARLOS JAMES: Our building

VASHON JAMES: They did?

| CARLOS JAMES: | They just ran in Individual E's crib and they ran in ah PJ [Individual D] and them crib. |
|---|---|
| VASHON JAMES: | And they they skipped downstairs Los? |
| CARLOS JAMES: | They skipped our crib, yeah. |
| VASHON JAMES: | Get the fuck out of here. |
| CARLOS JAMES: | On everything, the search warrant was for PJ for PJ crib, but they ended up going in Individual E crib too though. |
| VASHON JAMES: | Man, I got a mother fucking, a G under the bed boy, worth of work boy. Cause I was going to come and finish it, man. I'm finna go get that shit, man. |
| CARLOS JAMES: | Yeah they just hit that building. They just took all the pipes [firearms]. |
| VASHON JAMES: | What? |
| CARLOS JAMES: | They took all they pipes. I gave [Individual E] a tribby yesterday. They took that, his pipes [guns] and he had three pipes [guns] and PJ [Individual D] had a pipe upstairs they took that. |

128.     Based on my training and experience, and the training and experience of other law enforcement officers involved in this investigation, I believe that in the above exchange: (1) CARLOS JAMES stated that "they skipped our crib," meaning that law enforcement officials searched the basement and second floor apartment but not the first floor apartment of the 1742 Mayfield Address used by CARLOS JAMES and VASHON JAMES; (2) VASHON JAMES stated he had a "G under the bed, boy, worth of work boy. Cause I was going to come and finish it man," meaning that

VASHON JAMES has approximately $1,000 worth of narcotics that he intends to retrieve from under a bed; and (3) CARLOS JAMES stated, "I gave [Individual E] a tribby yesterday. They took that," meaning that CARLOS JAMES gave Individual E a "tribby"[40] that law enforcement seized during the execution of the search warrant.

129. On or about April 25, 2022, at approximately 3:31 p.m. (TP2 Session 975), CARLOS JAMES, using Target Phone 2, called VASHON JAMES, using the Vashon James Phone. CARLOS JAMES stated, "I was talking to Will he's like I know you finna gonna move now. He like please don't move. I'm like mad as hell."

130. Based on my training and experience, the training and experience of other law enforcement officers involved in this investigation, and my knowledge of the investigation, I believe that in the above exchange: (1) CARLOS JAMES stated that he told "Will," the landlord of the 1742 Mayfield Address, that CARLOS JAMES intended to move from the building; and (2) "Will" asked CARLOS JAMES not to move from the building.

131. As the conversation between CARLOS JAMES and VASHON JAMES continued, during another portion of the call, CARLOS JAMES stated, "Them talkin' about give her five a week. Man, they better get they ass outta there." VASHON JAMES responded, "Who?" CARLOS JAMES stated, "Rico [ROSE][41] baby mama

---

[40] Law enforcement officials are unclear as to what CARLOS JAMES meant by the word "tribby" during this conversation.

[41] According to an open-source search, ROSE has a Facebook account with the display name "Sneko Rico Rose" and an Instagram account with the display name "s_rico_76."

talkin' bout we can come to her crib, give her a nickle a week. I'm finna find another crib and just pay the rent."

132.    Based on my training and experience, the training and experience of other law enforcement officers involved in this investigation, and my knowledge of the investigation, I believe that in the above exchange: (1) CARLOS JAMES stated that "Rico's baby mama," the mother of ROSE's child, offered to let the DTO use her apartment for "a nickle a week," meaning $500 a week; and (2) CARLOS JAMES stated, "I'm finna find another crib and just pay the rent," meaning that CARLOS JAMES does not wish to pay ROSE's child's mother and will find a new apartment for the DTO to use to continue preparing and packaging narcotics. Thereafter, as described below, law enforcement officials conducting surveillance observed that CARLOS JAMES and ROSE began packaging narcotics for distribution at the Flournoy Address.

## V.    CARLOS JAMES, ROSE, and WILLIAMS Regularly Re-Supplied BROOKS with Narcotics

133.    Between on or about January 4, 2022 and approximately August 30, 2022, based on observations made on surveillance and wire interceptions of Target Phones 1 and 2, CARLOS JAMES, ROSE, and WILLIAMS packaged narcotics for distribution at multiple stash locations and distributed those narcotics to BROOKS. In addition to the re-supplies of narcotics to BROOKS that occurred on or about January 4, 2022 and March 4, 2022 that are described above, the distributions of narcotics to BROOKS included, but were not limited to, the following:

70

a. On or about March 12, 2022, CARLOS JAMES and ROSE supplied BROOKS with narcotics at the 1742 Mayfield Address;

b. On or about April 9, 2022, CARLOS JAMES and ROSE supplied BROOKS with narcotics from the 1742 Mayfield Address;

c. On or about April 11, 2022, CARLOS JAMES and ROSE supplied BROOKS with narcotics from the 1742 Mayfield Address;

d. On or about April 15, 2022, CARLOS JAMES supplied BROOKS with narcotics from the 1742 Mayfield Address;

e. On or about April 19, 2022, CARLOS JAMES supplied BROOKS with narcotics at the 1742 Mayfield Address;

f. On or about May 4, 2022, CARLOS JAMES and ROSE prepared and packaged narcotics at the Flournoy Address for distribution;

g. On or about May 7, 2022, CARLOS JAMES and ROSE prepared and packaged narcotics at the Flournoy Address for distribution;

h. On or about May 12, 2022, CARLOS JAMES and ROSE prepared and packaged narcotics at the Flournoy Address for distribution;

i. On or about May 15, 2022, CARLOS JAMES and ROSE prepared and packaged narcotics at the Flournoy Address for distribution;

j. On or about May 19, 2022, CARLOS JAMES and ROSE prepared and packaged narcotics at the Flournoy Address for distribution;

k. On or about May 23, 2022, CARLOS JAMES and ROSE prepared and packaged narcotics at the Flournoy Address for distribution;

l.　　On or about May 24, 2022, CARLOS JAMES and ROSE prepared and packaged narcotics at the Flournoy Address for distribution;

m.　　On or about May 27, 2022, CARLOS JAMES and ROSE prepared and packaged narcotics at the Flournoy Address for distribution;

n.　　On or about May 30, 2022, CARLOS JAMES and ROSE prepared and packaged narcotics at the Flournoy Address;

o.　　On or about May 30, 2022, CARLOS JAMES and ROSE supplied BROOKS with narcotics at the Flournoy Address;

p.　　On or about June 1, 2022, CARLOS JAMES and ROSE prepared and packaged narcotics at the Flournoy Address for distribution;

q.　　On or about June 3, 2022, CARLOS JAMES and ROSE supplied BROOKS with narcotics;

r.　　On or about June 7, 2022, CARLOS JAMES and ROSE prepared and packaged narcotics at the Flournoy Address;

s.　　On or about July 20, 2022, CARLOS JAMES and ROSE supplied BROOKS with narcotics; and

t.　　On or about July 24, 2022, CARLOS JAMES and ROSE supplied BROOKS with narcotics.

The following details some of the aforementioned re-supplies of narcotics.

**A.　　June 1, 2022 Re-Supply of Narcotics and Seizure of Narcotics Distribution and Packaging Materials**

134.　　On or about June 1, 2022, at approximately 8:07 a.m., law enforcement officials conducting surveillance through a CPD pole and CPD pod camera observed

ROSE drive to the Flournoy Address in Rose Vehicle 1. ROSE exited the vehicle and walked toward the rear of the Flournoy Address.

135. On or about June 1, 2022, at approximately 8:42 a.m. (TP2 Session 1958), CARLOS JAMES, using Target Phone 2, called BROOKS, using Target Phone 1). During the call, CARLOS JAMES and BROOKS had the following exchange:

| BROOKS: | Is you up? |
|---|---|
| CARLOS JAMES: | Yeah I'm up, me an' Rico [ROSE] talkin' shit. |
| BROOKS: | Oh, you on that? You takin care of that? Letting you know I need you. |
| CARLOS JAMES: | Yeah. |
| BROOKS: | Okay, call me, call me when you're ready. |
| CARLOS JAMES: | Okay. |

136. Based on my training and experience, and the training and experience of other law enforcement officers involved in this investigation, I believe that in the above exchange: (1) CARLOS JAMES's told BROOKS that he was speaking with "Rico," meaning ROSE; and (2) BROOKS said, "Letting you know I need you," meaning that BROOKS needed a resupply of narcotics.[42]

137. At approximately 12:24 p.m., law enforcement officers conducting CPD pole camera and mobile surveillance observed ROSE exit the rear of the Flournoy Address carrying a full weighted black plastic shopping bag. ROSE entered the

---

[42] Further, on or about June 1, 2022, at approximately 10:35 a.m. (TP2 Session 1968), CARLOS JAMES, using Target Phone 2, received a call from BROOKS, using Target Phone 1. During their conversation, BROOKS spoke with ROSE on CARLOS JAMES's phone about a separate topic, which further confirmed that CARLOS JAMES and ROSE were together.

driver's side door of Rose Vehicle 1 and departed the area. Law enforcement officials maintained surveillance of Rose Vehicle 1.

138. On or about June 1, 2022, at approximately 12:25 p.m. (TP2 Session 1974), CARLOS JAMES, using Target Phone 2, received a call from BROOKS, using Target Phone 1. During their call, CARLOS JAMES told BROOKS, "I'm walking out the door right now," and BROOKS responded, "Yeah, cause today's the first, I need that."

139. Based on my training and experience, and the training and experience of other law enforcement officers involved in this investigation, I believe that in the above exchange: (1) CARLOS JAMES stated that he was headed out the door to re-supply BROOKS with narcotics; and (2) BROOKS's response that "today's the first," requested that CARLOS JAMES re-supply BROOKS with narcotics because there is a bigger demand for narcotics at the beginning of the calendar month.[43]

140. On or about June 1, 2022, at approximately 12:30 p.m., while traveling northbound on Hamlin Avenue in Chicago, law enforcement officials conducting physical surveillance of Rose Vehicle 1 observed ROSE discard a black plastic grocery bag in a garbage can on the parkway located at approximately 343 North Hamlin

---

[43]     CARLOS JAMES and BROOKS previously discussed that narcotics sales slow down towards the end of the month and pick up again at the beginning of the month. For example, on or about March 25, 2022, at approximately 9:37 a.m. (TP1 Session 5462), CARLOS JAMES, using Target Phone 2, called BROOKS, using Target Phone 1. During their conversation, CARLOS JAMES asked, "What they saying, man?" BROOKS stated, "Nobody saying none. Ain't nobody got no money. Ain't no complains about the work [narcotics]. I done gave out so much mother fucking credit it's ridiculous." CARLOS JAMES responded, "It's the end of the month." BROOKS stated, "Yup. I think, I think early checks come out Monday," meaning that BROOKS expected narcotics sales to increase at the beginning of the following month.

Avenue. Law enforcement officials maintained surveillance on the garbage can and, at approximately 12:35 p.m., after ROSE left the area, law enforcement officials recovered the black plastic grocery bag from the garbage can. Law enforcement officials searched the black grocery bag, which contained, among other things, the following items:

        a.    broken Dormin-brand pill capsules;

        b.    Dormin-brand pill bottles and pill boxes;

        c.    One plastic bag of an unidentified white powder residue;

        d.    Three playing cards;

        e.    Two pieces of cardboard; and

        f.    Multiple plastic baggies and pieces of plastic bags

141. Based on my training and experience, and the training and experience of other law enforcement officers involved in this investigation, I understand that narcotics dealers utilize cutting agents when packaging narcotics to stretch their product to increase profits. One such cutting agent is Dormin, a nighttime sleep aid, which narcotics traffickers use to increase the supply of heroin because it aids in giving the user a tired and euphoric feeling. In addition, narcotics traffickers use small plastic baggies to package narcotics, such as heroin, for distribution and use playing cards to separate the narcotics.

142. On or about June 1, 2022, commencing at approximately 12:40 p.m., law enforcement officials conducting surveillance observed the following:

a.    At approximately 12:40 p.m., CARLOS JAMES departed the Flournoy Address carrying a white plastic bag that appeared to be weighted with an object.  CARLOS JAMES entered a silver Cadillac bearing registration CT95727 ("James Vehicle 3") registered to CARLOS JAMES and departed the area.

b.    At approximately 12:49 p.m., BROOKS, using Brooks Vehicle 3, drove to approximately 5911 West Chicago Avenue in Chicago.

c.    At approximately 12:56 p.m., CARLOS JAMES parked in the same vicinity as BROOKS.  He walked to BROOKS's driver's side window carrying the white weighted plastic shopping bag and handed the bag to BROOKS through the car window.  In exchange, BROOKS handed CARLOS JAMES a black plastic bag. CARLOS JAMES and BROOKS then departed the area.

d.    At approximately 1:05 p.m., BROOKS drove to the Mango Avenue Address and carried the weighted white plastic bag he received from CARLOS JAMES inside the building.

143.  Based on my training and experience, and the training and experience of other law enforcement officers involved in this investigation, and observations made on surveillance, I believe that, on or about June 1, 2022:  (1) ROSE and CARLOS JAMES prepared and packaged narcotics at the Flournoy Address; (2) ROSE attempted to hide evidence of their narcotics preparation by driving to another location to dispose of cutting agents and narcotics packaging; (3) CARLOS JAMES met with BROOKS to supply BROOKS with narcotics, and BROOKS provided

narcotics proceeds to CARLOS JAMES; and (4) BROOKS brought the narcotics to the Mango Avenue Address for future distribution.

**B.      On or about June 7, 2022, CARLOS JAMES and ROSE Re-Supplied BROOKS with Narcotics, and Law Enforcement Officials Seized Fentanyl-Laced Heroin from ROSE's Person**

144.    On or about June 7, 2022, beginning at approximately 7:32 a.m., law enforcement officials conducting surveillance through a CPD pole camera, CPD pod camera, and physical surveillance observed the following:

a.      At approximately 7:32 a.m., ROSE drove to the rear parking lot of the Flournoy Address in Rose Vehicle 1.  ROSE then entered the rear gate of the Flournoy Address.

b.      At approximately 2:44 p.m., ROSE exited the rear gate of the Flournoy Address and drove westbound towards Chicago Avenue.  Law enforcement officials maintained surveillance of Rose Vehicle 1.

c.      At approximately 2:52 p.m., law enforcement officials in an unmarked police vehicle observed ROSE conduct multiple traffic infractions, including accelerating past the posted speed limit, traveling left of the center line, and failing to use a turn signal.  At this time, law enforcement officials activated their police vehicle emergency lights and conducted a motor vehicle stop of ROSE at in the vicinity of Pulaski Avenue and Ferdinand Street.  The law enforcement officials were not equipped with body-worn cameras and their interactions with ROSE were not recorded.

145.    Before ROSE came to a stop, law enforcement officials observed ROSE moving around and bending over in the driver's seat compartment appearing to conceal something. Law enforcement officials made contact with ROSE and determined ROSE did not possess a valid driver's license.[44]   Based on law enforcement officials' observations of ROSE's traffic violations, his furtive movements within Rose Vehicle 1, and ROSE's operation of a vehicle without a valid driver's license, law enforcement officials asked ROSE to exit the vehicle, and ROSE complied.

146.    While speaking with ROSE, law enforcement officials observed that ROSE appeared to be nervous, as his left side of his face twitched and ROSE stuttered as he spoke to officers.  When law enforcement officials asked if ROSE possessed anything illegal within his vehicle, ROSE stated that he did not and gave law enforcement officials his oral consent to search Rose Vehicle 1.   When law enforcement officials asked if ROSE possessed anything illegal on his person, ROSE began to stutter while speaking and visibly shake.

147.    Law enforcement officials conducted a pat-down search of ROSE and felt a bulge in his left leg area.  ROSE stated he had braces on his legs from being shot several years ago.  While observing the area of ROSE's leg containing the brace, law enforcement observed a plastic bag tucked into ROSE's sock near the brace.  Police seized a knotted bag that contained approximately 11 smaller baggies of a white

---

[44]    According to the Illinois Secretary of State's records, ROSE's license was revoked on or about April 30, 2008.

powdery substance from ROSE's sock. After law enforcement seized the white bag, ROSE stated, "I forgot I had that" and told law enforcement officials that the substance was some "blows," meaning heroin. The substance in ROSE's possession subsequently lab-tested positive for approximately 4.885 grams of fentanyl and heroin.

148.    ROSE was not arrested for his possession of the narcotics due to the ongoing investigation. To maintain the confidentiality of the investigation of the CARLOS JAMES DTO, law enforcement officials told ROSE that he would not be arrested at that time due to his cooperation and that the suspected narcotics recovered would be inventoried under his name and sent for testing for possible future prosecution.

149.    On or about June 7, 2022 at approximately 3:01 p.m. (TP2 Session 2372), CARLOS JAMES, using Target Phone 2, placed an outgoing call to an unknown female ("UF-2"), using telephone number XXX-XXX-9332. CARLOS JAMES and UF-2 had the following exchange:

| | |
|---|---|
| UF-2: | Um, Rico [ROSE]. I was just on the phone with him. The police got him. |
| CARLOS JAMES: | The police got him? |
| UF-2: | Yeah they had pulled him [ROSE] over then he said they had asked him for a license and he was like you know. His license not valid right now. Then they told him, get out the car. He don't have nothing [narcotics], do he? I know he just left [the Flournoy Address] with y'all. |

| | |
|---|---|
| CARLOS JAMES: | Yeah he do man. |
| UF-2: | Damn, man. |
| CARLOS JAMES: | He had it cuffed in [narcotics] in his brace though. |
| UF-2: | Oh ok. Well maybe he'll be ok. Cause, he was like, can I get my cane? They ain't goin' make him take his shoes and stuff off. |

*　　*　　*　　*

| | |
|---|---|
| CARLOS JAMES: | I hope they don't make him |
| UF-2: | He put it up though, right? |
| CARLOS JAMES: | Yeah, he usually put it right there [in the leg brace]. |
| UF-2: | I hope he did, man. |

150. Based on my training and experience, and the training and experience of other law enforcement officers involved in this investigation, and observations made on surveillance, I believe that in the above exchange: (1) UF-2's statement, "the police got him" referred to the June 7, 2022 motor vehicle stop of ROSE; (2) UF-2's statements, "He don't have nothing, do he? I know he just left with y'all," inquired whether ROSE possessed narcotics and stated that ROSE just met with CARLOS JAMES; (3) CARLOS JAMES's response, "Yeah he do, man," indicated that CARLOS JAMES knew that ROSE possessed narcotics; and (4) CARLOS JAMES's statements, "he had it cuffed in his brace though," and "yeah, he usually put it right there" referred to CARLOS JAMES's observations that ROSE stored narcotics inside his leg brace.

80

151.   On or about June 7, 2022, at approximately 3:49 p.m. (TP2 Session 2380), CARLOS JAMES, using Target Phone 2, called BROOKS, using Target Phone 1.   BROOKS stated, "Aight, meet you at the spot."[45]   CARLOS JAMES responded, "Aight I'm right, I'll be right over there."

152.   Beginning at approximately 3:54 p.m., law enforcement officials conducting surveillance through a CPD pole and CPD pod camera observed the following:

a.   At approximately 3:54 p.m., CARLOS JAMES exited the rear entrance of the Flournoy Address carrying a black trash bag in his left hand, a white plastic bag in his right hand, and a satchel bag on his person. CARLOS JAMES entered James Vehicle 3 and drove westbound in the alley towards Central Park Avenue.

b.   At approximately 4:02 p.m., BROOKS exited the Mango Avenue Address and drove Brooks Vehicle 3 southbound on Mango Avenue.  At approximately 4:08 p.m., Brooks Vehicle 3 arrived in the area of Chicago Avenue, east of Austin Avenue.

c.   At approximately 4:17 p.m., CARLOS JAMES parked James Vehicle 3 on Chicago Avenue, east of Austin Avenue.  CARLOS JAMES exited James Vehicle 3, removed a white plastic bag from the rear passenger seat, and walked

---

[45]     On other occasions, including on or about June 1, 2022, June 3, 2022, and July 11, 2022, law enforcement officials conducting physical surveillance have observed CARLOS JAMES meet BROOKS in the same general area near Chicago Avenue and Menard Avenue in Chicago.

westbound carrying the white plastic bag towards Brooks Vehicle 3. Due to the vantage point of surveillance, law enforcement officials did not observe CARLOS JAMES meet with BROOKS.

d.     At approximately 4:22 p.m., Brooks Vehicle 3 and James Vehicle 3 departed the area traveling eastbound on Chicago Avenue.

e.     At approximately 4:28 p.m., BROOKS arrived at the Mango Avenue Address, exited Brooks Vehicle 3, and walked into the front entrance of the Mango Avenue Address carrying a white plastic bag with an appearance that is consistent with the white plastic bag CARLOS JAMES carried as he walked towards Brooks Vehicle 3.

153.   Based on my training and experience, and the training and experience of other law enforcement officers involved in this investigation, and observations made on surveillance, I believe that, on or about June 7, 2022: (1) BROOKS asked that CARLOS JAMES re-supply him with narcotics, and CARLOS JAMES agreed to meet BROOKS at the "spot" to distribute the narcotics; (2) BROOKS and CARLOS JAMES met near Chicago Avenue and Austin Avenue in Chicago to re-supply BROOKS; and (3) law enforcement officials observed BROOKS enter the Mango Avenue Address carrying a white plastic bag of narcotics that he received from CARLOS JAMES.

**C.     On or about July 24, 2022, CARLOS JAMES and ROSE Re-Supplied BROOKS with Narcotics**

154.   On or about July 24, 2022, at approximately 9:45 a.m., law enforcement officials conducting surveillance through a CPD pole camera, a CPD pod camera, and

physical surveillance observed ROSE drive to the Flournoy Address in Rose Vehicle 1. At approximately 3:11 p.m., ROSE departed the Flournoy Address.

155. According to T-Mobile's records, on or about July 24, 2022, at approximately 5:18 p.m., BROOKS, using Target Phone 1, called CARLOS JAMES, using Target Phone 2, which call was approximately six seconds in duration. At approximately 5:54 p.m., BROOKS, using Target Phone 1, called CARLOS JAMES, using Target Phone 2, which call was approximately 13 seconds in duration.

156. Commencing at approximately 5:56 p.m., law enforcement conducting surveillance through a CPD pole camera, a CPD pod camera, and physical surveillance observed the following:

    a. At approximately 5:56 p.m., CARLOS JAMES exited the Flournoy Address carrying a large light-colored bag, which CARLOS JAMES placed behind the rear driver's seat of James Vehicle 3. CARLOS JAMES then departed the area.

    b. At approximately 5:57 p.m., BROOKS exited the Mango Avenue Address and departed the area in Brooks Vehicle 2.

    c. Commencing at approximately 6:16 p.m., BROOKS returned to the Mango Avenue Address carrying a large light-colored bag that resembled the appearance of the bag CARLOS JAMES carried from the Flournoy Address. BROOKS brought the light-colored bag inside the Mango Avenue Address.

157. Based on my training and experience, the training and experience of other law enforcement officers involved in this investigation, and my knowledge of

the investigation, I believe that based on the above-referenced toll records observations made on surveillance, and my knowledge of the investigation, on or about July 24, 2022: (1) BROOKS spoke with CARLOS JAMES about obtaining a re-supply of narcotics; (2) CARLOS JAMES provided BROOKS with a bag containing narcotics for street distribution; and (3) BROOKS brought the narcotics to the Mango Avenue Address for storage and street distribution.

## IV. BROOKS, BIRT, and SINGLETON Engaged in Hand-to-Hand Narcotics Transactions with Street-Level DTO Customers

158. On or about September 16, 2022 law enforcement officials installed a CPD pole camera near the Mango Avenue Address. The CPD pole camera displays the north side of the building, the street located to the north of the residence, and the front sidewalk and front entrance way. Additionally, the pole camera captures the east and west side of the intersection of Mango Avenue and Wabansia Avenue.

159. Between on or about September 16, 2022 and August 31, 2022, law enforcement officers conducted regular surveillance of the vicinity of the Mango Avenue Address through the CPD pole and CPD Pod camera. During this period, surveillance regularly observed patterns of behavior that, in my experience and based on my familiarity with this investigation, show that the vicinity of the Mango Avenue Address functioned as a drug trafficking location in the DTO Territory.

160. On numerous occasions, including, but not limited to March 23, 2022, March 25, 2022, May 24, 2022, and June 1, 2022, surveillance observed DTO members, including BROOKS, KNIGHT, BIRT, and CANO, standing or sitting near the front entrance of the Mango Avenue Address. Surveillance observed individuals

84

approach the area around the Mango Avenue Address, both on foot and by car, speak briefly with individuals situated on the block, and then conduct hand-to-hand exchanges with BROOKS, KNIGHT, BIRT and CANO.

161.    Further, on or about August 9, 2022, beginning at approximately 11:00 a.m., law enforcement officials conducting surveillance of the Mango Avenue Address through a CPD pole camera and physical surveillance observed the following:

a.    At approximately 11:28 a.m., BIRT rode a bicycle to the Mango Avenue Address.[46]    BIRT met BROOKS outside of the residence and BIRT and BROOKS walked into the building together.

b.    At approximately 11:29 a.m., BIRT exited the Mango Avenue Address and walked to the northeast corner of Wabansia and Mango Avenues.    BIRT briefly spoke to an unknown driver of a green van.[47]    BIRT then returned to the Mango Avenue Address and entered the building.

c.    At approximately 11:30 a.m., BIRT exited the Mango Avenue Address and walked back to the dark green van.    BIRT spoke to the driver, returned to the Mango Avenue Address, and departed the area on his bicycle.    From the

---

[46]    Law enforcement officials positively identified BIRT through a comparison of a CPD booking photograph to the person interacting with BROOKS on August 9, 2022. Further, on or about September 16, 2021, CS-2 traveled to 1638 Mayfield Avenue in Chicago, another suspected stash location for the DTO, and made a controlled purchase of three individual user quantities of suspected heroin and crack cocaine from an individual whom law enforcement identified as BIRT based on his CPD booking photograph.  According to the DEA laboratory, BIRT distributed approximately .317 grams of cocaine to CS-2.  The FBI is waiting for lab results for the suspected heroin.

[47]    From the vantage point of surveillance, law enforcement officials did not determine the registration of the green van.

vantage point of surveillance, law enforcement officials could not determine whether BIRT handed anything to the driver of the green van.

162. Law enforcement officials followed BIRT in an unmarked law enforcement vehicle. As law enforcement officials approached BIRT's location, BIRT kept looking back at the law enforcement vehicle and rode his bicycle onto the sidewalk, leading law enforcement officials to believe that BIRT was attempting to elude them. Law enforcement officials observed that BIRT stopped riding his bicycle and dropped a small clear object to the ground. BIRT also attempted to conceal his left hand from law enforcement officials' view by closing his hand and blading his body (turning slightly to his left side).

163. Based on BIRT's interactions with the driver of the green van, that BIRT appeared to ride his bicycle onto the sidewalk to avoid law enforcement officials, and BIRT's actions of dropping a small clear object to the ground and attempting to conceal his hand, law enforcement officials suspected that BIRT had engaged in a narcotics transaction with the green van and possessed narcotics.

164. Law enforcement officials asked that BIRT travel to their vehicle, and BIRT complied with the request. As law enforcement officials exited their vehicle to speak to BIRT, they observed BIRT drop a small pink item to the ground from his left hand. Law enforcement officials received one pink-tinted baggie that contained a white powdery substance of suspected heroin from the ground. Law enforcement traveled to where BIRT dropped the small clear object and recovered a small clear plastic bag containing multiple smaller purple-tinted baggies of a substance that

field-tested positive for crack cocaine. Law enforcement officials conducted a pat-down of BIRT and found approximately $100 on his person. The FBI submitted the suspected narcotics to the DEA laboratory and is waiting for the results.

165. Law enforcement officials asked BIRT about the suspected narcotics, and BIRT responded that he was scared and dropped some rocks and a blow, which, based on my training and experience, referred to crack cocaine and one user amount of heroin.[48] As a ruse, law enforcement officials told BIRT that they were in the area to investigate violent crime and firearms. Law enforcement officials did not arrest BIRT for a narcotics offense to avoid compromising the investigation and calling attention to their surveillance of the Mango Avenue Address.

166. Based on my training, experience, and familiarity with this investigation – including the movements of the individuals observed near the Mango Avenue Address, CS-2's January 4, 2022 controlled purchase of fentanyl-laced heroin from the Mango Avenue Apartment, the August 9, 2022 hand-to-hand transaction observed near the Mango Avenue Address and BIRT's possession of narcotics; and the August 31, 2022 subsequent seizure of distribution quantities of suspected heroin from the Mango Avenue Apartment as described below – I believe that BROOKS, KNIGHT, BIRT, and CANO worked as street-level narcotics dealers, runners, money collectors, or marketers at or near the Mango Avenue Address.

167. A CPD pod camera located on the 1600 block of Mayfield Avenue and had a view of the 1600 and 1700 blocks of Mayfield Avenue, including the street and

---

[48]  Law enforcement officials' interaction with BIRT was not audio or video recorded.

front sidewalk area of the 1638 Mayfield Address. During this period, surveillance regularly observed patterns of behavior that, in my experience and based on my familiarity with this investigation, show that the vicinity of the 1638 Mayfield Address functioned as a drug trafficking location in the DTO Territory.

168. On numerous occasions, including, but not limited to March 9, 2022, March 23, 2022, April 13, 2022, April 20, 2022, and June 7, 2022, surveillance observed DTO members, including BROOKS, BIRT, and SINGLETON standing or sitting near the sidewalk and street in front of the 1638 Mayfield Address. Surveillance observed individuals approach the front area of the 1638 Mayfield Address, speak briefly with individuals situated there, and conduct a quick hand-to-hand exchange with BROOKS, BIRT, and SINGLETON.

169. Based on my training, experience, and familiarity with this investigation – including the movements of these individuals, CS-2's September 15, 2021 and September 16, 2021 controlled purchases of fentanyl-laced heroin and crack cocaine from BIRT and SINGLETON at the 1638 Mayfield Address, and the August 31, 2022 subsequent seizure of suspected narcotics packaging from Unit 1 of the 1638 Mayfield Address as described below, – I believe that BROOKS, BIRT, and SINGLETON worked as street-level narcotics dealers, runners, money collectors, or marketers at or near the 1638 Mayfield Address.

## VII.   Law Enforcement Searches of DTO Stash Locations

### A.   Mango Avenue Apartment

170.   On or about August 31, 2022, at approximately 6:00 a.m., law enforcement officials executed a judicially-authorized search of the Mango Avenue Apartment.  When law enforcement entered the residence, CANO and BROOKS were present inside.  Law enforcement officials detained BROOKS for officer safety and pending execution of the search warrant.

171.   During the execution of the search warrant, law enforcement officials observed that the Mango Avenue Apartment had two bedrooms.  The first, or primary, bedroom had a closet that contained men's clothing.  The second, or spare, bedroom appeared to used for storage of clothing and other personal effects at the time of the search.

172.   Law enforcement officials recovered, among other things, the following firearms and suspected narcotics inside the primary bedroom:

a.   A loaded Glock Model 22, .40 caliber pistol bearing serial number AARN333 (the "Glock firearm"), which was located under the mattress.  The Glock firearm's magazine was loaded with approximately 12 hollow point bullets.[49]

b.   A loaded Smith & Wesson Model 27-5, .357 caliber Magnum revolver bearing serial number BET9680, which was located under the mattress.

---

[49]   Based on my training and experience and the training and experience of law enforcement officials involved in this investigation, hollow point bullets expand on impact and cause more damage to the target than other ammunition.

c.      A loaded Smith & Wesson Model 23-1, .38 caliber revolver bearing serial number 37894, which was located under the mattress.

d.      A safe containing approximately 25 "jabs," or between approximately 300 and 350 baggies ("blows") that contained a white powdery substance, which, based on my training and experience appeared to be heroin, and approximately 13 baggies that contained a white rock-like substance, which, based on my training and experience, appeared to be crack cocaine. [50]

e.      A total of approximately 7 jabs, or between approximately 84 and 98 blows, of baggies containing a white powdery substance, which, based on my training and experience, appeared to be heroin, scattered throughout the bedroom. [51]

f.      Two safes that contained a total of approximately $12,372 of suspected narcotics proceeds.

g.      A large white reusable grocery bag with the lettering "ALDI" that contained Arizona-brand drink bottles and Pringles-brand cans with false bottoms.

h.      Small plastic baggies resembling narcotics packaging.

i.      A handwritten ledger tracking debts owed to BROOKS for narcotics sales with DTO customers ("Brooks Narcotics Ledger 1").

---

[50]    The suspected narcotics were not field-tested. Based on my training and experience, the training and experience of other law enforcement officers involved in this investigation, and my knowledge of the investigation, drug traffickers frequently possess firearms and ammunition to protect their illegal product.

[51]    The suspected narcotics seized from the primary bedroom field-tested positive for heroin and crack cocaine. The field testing equipment utilized by law enforcement officials does not test for the presence of fentanyl.

173. Law enforcement observed multiple names written inside the ledger along with amounts of money that, based on my training, experience, and knowledge of the investigation, reflected amounts of money that street-level narcotics users owed to BROOKS. Names within the ledger matched identifications of narcotics users who contacted BROOKS over Target Phone 1 requesting narcotics.

174. For example, on or about March 27, 2022 at approximately 9:31 a.m. (TP1 Session 6043), BROOKS, using Target Phone 1, received an incoming telephone call from Individual F, using XXX-XXX-2673. During their conversation:

a.     Individual F requested "four," meaning four individual user-quantities of narcotics. BROOKS responded, "We ain't got no dope man. We won't have no dope [heroin] till like 12:00."

b.     As the conversation continued, BROOKS stated, "I got some old dope [heroin] man. I don't even wanna sell it cause I don't know how it is." Individual F responded, "I don't care if it's old dope [heroin]. I'll pay for it. I gotta have something in me. I'm sick."

175. Based on my training and experience, the training and experience of other law enforcement officers involved in this investigation, and my knowledge of the investigation, I believe that in the above exchange: (1) Individual F, a street-level customer of the DTO, asked to purchase four blows of heroin; (2) BROOKS responded that he would receive a fresh supply of "dope," meaning heroin, at approximately 12:00 p.m.; (3) BROOKS stated that he had an older supply of heroin but was unsure of the quality of those narcotics because of their age; and (4) Individual F stated that

he was "sick," meaning experiencing heroin withdrawal symptoms, and he wished to purchase the heroin BROOKS currently had in his possession.

176.     Brooks Narcotics Ledger 1 contains a page containing Individual F's first name along with multiple numbers crossed out except for the number thirty.

177.     Based on my training and experience, the training and experience of other law enforcement officers involved in this investigation, and my knowledge of the investigation, I believe that:   (1) Brooks Narcotics Ledger 1 is a ledger documenting narcotics trafficking and the amounts that street-level customers paid and owed to BROOKS for distributing narcotics to them; and (2) the handwritten notes in the ledger identify that Individual F currently owes BROOKS $30 for narcotics sales.

178.     During the search of the Mango Avenue Address, law enforcement officials brought CANO to a law enforcement vehicle to speak with agents.   Law enforcement officials did not handcuff CANO and informed her that she was not under arrest.   At the beginning of the interview, law enforcement officials advised CANO of her *Miranda* rights, which CANO stated that she understood.   CANO also signed a written *Miranda* waiver form.[52]

179.     During CANO's interview with law enforcement officials, she provided the following information:

      a.     BROOKS and CANO live together at the Mango Avenue Apartment and sleep in the primary bedroom.

---

[52]     Law enforcement officials' interview of CANO was not audio or video recorded.

b.     BROOKS sells narcotics in the vicinity of the Mango Avenue Apartment but not inside the apartment itself. An individual named "Lo," a reference to CARLOS JAMES, re-supplies BROOKS with narcotics.[53] "Lo" supplied BROOKS with pre-packaged "jabs" of heroin. BROOKS placed the heroin inside of Arizona-brand drink bottles and Pringles-brand cans to conceal the narcotics.

c.     BROOKS used to meet "Lo" [CARLOS JAMES] on Mayfield Avenue to be re-supplied with narcotics. BROOKS and "Lo" [CARLOS JAMES] now meet at a store on Austin Avenue to re-supply BROOKS.[54] "Lo" [CARLOS JAMES] gave BROOKS approximately 2 jabs of heroin each time he re-supplied BROOKS.

d.     CANO did not recall BROOKS carrying an "ALDI" bag but recalled that BROOKS carried white or black plastic bags to transport narcotics. During the last month, "Lo" [CARLOS JAMES] and BROOKS used black plastic bags to carry narcotics, which BROOKS preferred.

e.     A "jab" of heroin consisted of 14 blows for the "workers," meaning the street-level narcotics dealers, and 12 blows for the "customers," meaning a street-level customer.[55] Each jab cost approximately $100. "Lo" [CARLOS JAMES] stapled

---

[53]    CANO stated that BROOKS referred to "Lo" as "Birdman," which as described above, is a nickname for CARLOS JAMES, but that "Birdman" was not his known nickname to other people in the neighborhood.

[54]    As described in paragraph 142 above, law enforcement officials conducting surveillance observed CARLOS JAMES meet BROOKS near the intersection of Chicago and Austin Avenues in Chicago.

[55]    Based on my training, experience, and knowledge of the investigation, I interpret CANO's statements to mean that street-level dealers received a 14-blow jab of heroin but advertised to the customer that each jab consisted of 12 blows. If a street-level narcotics dealer sold 14 blows in separate transactions, his or her profit on the jab would be approximately $40 after paying the $100 cost of the jab to the DTO. If the street-level

two baggies together to comprise one blow because it made the customer believe that he or she received more heroin in each blow.

      f.    CANO identified the following street-level sellers of narcotics for the DTO: LAMB (also known as "Little Dave"); "Avis" [KNIGHT], "CC" [SINGLETON], "Teddy," and "Tommy" [BIRT]. CANO identified the Knight Phone as KNIGHT's telephone number and the Birt Phone as BIRT's telephone number.[56]

      g.    CANO stated that "CC" [SINGLETON] lived at the 1638 Mayfield Address, which is a location where narcotics is sold to street customers. To conceal her heroin habit from BROOKS, CANO purchased heroin from "Teddy" or "Tommy" [BIRT].

      h.    An individual CANO knows as "Trump" [WILLIAMS] wished to prepare distribution quantities of crack cocaine for BROOKS. "Trump" [WILLIAMS] uses a wheelchair and lives next door to the 1638 Mayfield Address.[57]

      i.    CANO denied that the narcotics BROOKS sold contained fentanyl, stating that CANO used a testing kit to test the narcotics and the narcotics never tested positive for fentanyl.

---

narcotics dealer sold 12 blows to a customer in a single transaction, the street-level dealer would keep the money earned from selling the two additional blows given to him/her by the DTO.

[56] CANO identified different telephone numbers than the numbers described above for LAMB and SINGLETON. As described in paragraph 6(c) above, narcotics traffickers often change phone numbers to avoid law enforcement detection.

[57] While conducting surveillance through a CPD pod camera, law enforcement officials observed the person they identified as WILLIAMS utilizing a wheelchair on 1600 block of Mayfield Avenue near his residence.

j.      "Lo" [CARLOS JAMES] does not supply BROOKS with crack cocaine.  A person who previously supplied BROOKS crack cocaine, nicknamed "Pudy," is deceased, and BROOKS does not have a current supply of crack cocaine. On or about August 30, 2022, CANO overheard "Los" [CARLOS JAMES] and BROOKS speak on the telephone and argue about the sale of crack cocaine.

k.      None of the firearms located inside the Mango Avenue Apartment belong to CANO.  CANO knew that BROOKS had stored firearms inside the Mango Avenue Apartment and asked that BROOKS remove the firearms from the residence, but CANO did not know whether BROOKS had done so.

l.      Approximately three weeks ago, CANO overheard BROOKS speak on the telephone to an unidentified person and offered to pay him $100 for a firearm, but the seller did not agree to sell BROOKS the firearm for that price.

m.      CANO stated that her memory was not great because of a surgery for a brain aneurysm.  CANO expects to have another surgery in the near future. CANO stated that she loses her train of thought and sometimes forgets what she was supposed to be doing.

180.    CANO gave law enforcement officials her written consent to search Brooks Vehicle 2, a vehicle that is used by BROOKS and is registered to CANO. During their search of Brooks Vehicle 2, law enforcement officials seized from the center console a handwritten ledger ("Brooks Narcotics Ledger 2"), which contains names of customers and numbers indicating the dollar amounts owed or paid to BROOKS for narcotics.

181.    For example, on or about March 9, 2022 at approximately 11:46 a.m., BROOKS, using Target Phone 1 (TP1 Session 2244), received a call from Individual G, using telephone number XXX-XXX-1844.  During their conversation, Individual G asked to purchase "five," meaning five individual user quantities of narcotics. BROOKS responded, "You got money for five?" BROOKS further stated, "You know, you got a bill [narcotics debt] with me now" and that Individual G owes him $250.

182.    Based on my training and experience, the training and experience of other law enforcement officers involved in this investigation, and my knowledge of the investigation, I believe that in the above exchange:  (1) Individual G, a street-level customer of the DTO, asked to purchase five blows of heroin from BROOKS; and (2) BROOKS responded that Individual G owes him a narcotics debt of $250.

183.    Brooks Narcotics Ledger 2 contains a page that identifies Individual G's first name along with multiple groups of numbers crossed out except the number two hundred.

184.    Based on my training and experience, the training and experience of other law enforcement officers involved in this investigation, and my knowledge of the investigation, I believe that:  (1) Brooks Narcotics Ledger 2 is a ledger documenting narcotics trafficking and the amounts that street-level customers paid and owed to BROOKS for distributing narcotics to them; and (2) the handwritten notes in the ledger identify that Individual G currently owes BROOKS $200 for narcotics sales.

185.   BROOKS declined to speak to law enforcement officials during their execution of the search warrants.

### B.     1638 Mayfield Address

186.   On or about August 31, 2022, law enforcement officials executed a judicially-authorized search of 1638 North Mayfield Avenue, Unit 1, in Chicago (the "1638 Mayfield Address").   According to Individual H, who owns the multi-unit building located at 1638 North Mayfield Avenue, BIRT lived in the basement area of Unit 1.  During the search of the basement area of the 1638 North Mayfield Address, law enforcement officials recovered, among other things:

a.      Approximately 32 rounds of ammunition that were located in the rafters, on the floor, inside a shoe box, and inside drawers; and

b.      blue baggie containing a blue rock-like substance of suspected crack cocaine; and

c.      At least 20 small blue-colored baggies that resemble the size of crack cocaine packaging used by the DTO.

d.      Clear narcotics packaging which resembled packaging the packaging seized by law enforcement when conducting the June 1, 2022 trash pull described above.

## VIII.  Between Approximately April 7, 2021 and August 31, 2022 the CARLOS JAMES DTO distributed at least 35 Kilograms of Fentanyl-Laced Heroin and Quantities of Crack Cocaine

236.   Based on the quantity of narcotics purchased by a confidential source throughout the course of the investigation, intercepted phone calls reflecting

thousands of dollars of narcotics proceeds generated on a weekly basis during the course of the interception periods alone, surveillance, ledgers recovered during the search of the Mango Avenue Apartment, and CPD pod camera video reflecting street-level distributions near the Mango Avenue Address and the 1638 Mayfield Address, I believe that, between on or about April 7, 2021 and August 31, 2022, members of the CARLOS JAMES DTO possessed with intent to distribute and distributed 35 kilograms or more of heroin and a quantity of crack cocaine.

238.    As described above, between on or about September 15, 2021 and February 7, 2022,  CS-2 conducted approximately nine controlled purchases of approximately 76.99 grams of fentanyl-laced heroin and .52 grams of crack cocaine from BROOKS, BIRT, and SINGLETON.

239.    Based on the investigation, including the controlled purchases made by CS-2, surveillance of DTO stash locations (the Mango Avenue Address, the 1638 Mayfield Address, the 1742 Mayfield Address, and the Flournoy Address),  review of CPD pole and POD camera video, seizures of crack cocaine from BROOKS and BIRT, and intercepted phone calls, law enforcement officials understand that:

a.    The CARLOS JAMES DTO obtained and distributed heroin laced with fentanyl to customers in the DTO Territory and in the surrounding area in approximately .4 to .6-gram user quantities wrapped in baggies and stapled together in two-baggie blows.  Customers purchased individual blows for approximately $10 or a jab of heroin, which contained 12 to 14 blows, for $100.  Street-level traffickers, such as BROOKS, BIRT, SINGLETON, LAMB, and KNIGHT earned approximately

$40 as profit for each jab, and the remainder of the proceeds directed to the street-level boss CARLOS JAMES. As reflected in wire communications intercepted over Target Phone 1, the phone used by BROOKS, (TP1 Session 4724) (March 21, 2022), in addition to the profit BROOKS normally made from selling jabs of heroin, CARLOS JAMES occasionally provided BROOKS with three free jabs to sell for BROOKS's personal profit because he managed the other street-level sellers.

b.      The CARLOS JAMES DTO distributed approximately $3,920 worth of fentanyl-laced heroin and approximately $1,261 worth of crack cocaine approximately every three days, and typically operated the CARLOS JAMES DTO seven days per week from the hours of 6:30 a.m. through midnight. Based on intercepted phone calls and observations made on surveillance, law enforcement officials believe that CARLOS JAMES, ROSE, and BROOKS provided street-level dealers with one jab of heroin, or 14 blows, and approximately 12 or 13 individual bags of crack cocaine.[58] Those DTO members were re-supplied approximately every three days.

c.      In distributing approximately 28 jabs of heroin every three days, the CARLOS JAMES DTO sold approximately 3,406 jabs per year or 47,693 blows, which each contained approximately 19,077 to 28,616 grams of fentanyl-laced heroin (approximately 28.6 kilograms). Accordingly, I believe that, during approximately on or about April 7, 2021 through August 31, 2022, the CARLOS JAMES DTO

---

[58]      During the April 7, 2021 search of BROOKS and his vehicle, law enforcement officials seized approximately 13 bags of crack cocaine. On or about August 9, 2022, law enforcement officials seized approximately 12 bags of crack cocaine from BIRT.

distributed at least 35,201 grams or approximately 35 kilograms or more of fentanyl-laced heroin.

       d.     Based on wire interceptions over Target Phone 1 and Target Phone 2, BROOKS supplied BIRT, LAMB, KNIGHT, SINGLETON, and others with at least one jab of crack cocaine, containing approximately 13 individual user quantities, approximately every three days (totaling approximately 78 individual user quantities every three days). In distributing approximately 78 individual user quantities (*i.e.,* 6 jabs) of crack cocaine every three days, the CARLOS JAMES DTO sold approximately 898 jabs or 11,674 individual user quantities, which each individual user quantity contained approximately .1 gram of crack cocaine (approximately 1.167 kilograms). Accordingly, I believe that, during approximately on or about April 7, 2021 through August 31, 2022, the CARLOS JAMES DTO sold at least 1.167 kilograms or more of crack cocaine.

       e.     Further, throughout the 30-day interception of Target Phone 1, BROOKS was intercepted discussing heroin and crack cocaine transactions with street-level customers and DTO members. Based on a review of intercepted calls of Target Phone 1, used by BROOKS, between approximately on or about March 1, 2022 through March 29, 2022, and Target Phone 2, used by CARLOS JAMES between approximately April 8, 2022 and May 7, 2022, and from approximately May 23, 2022 to June 21, 2022, an approximately 60-day period:

       i.     BROOKS discussed distributing narcotics to at least 10 individual street-level narcotics customers.

ii.     BROOKS discussed the distribution of approximately 28 jabs of heroin every three days (approximately 235 grams of fentanyl-laced heroin per month) and the distribution of 6 jabs of crack cocaine every three days (approximately 78 grams of crack cocaine per month).[59]

iii.     BROOKS paid CARLOS JAMES approximately $3,600 to $3,900 in narcotics proceeds approximately every three days.  For example, on or about March 22, 2022, during an intercepted call between BROOKS, using Target Phone 1, and WILLIAMS, using the Williams Phone (TP1 Session 4855), BROOKS discussed with WILLIAMS turning in $3,900 to CARLOS JAMES for a supply of narcotics.  On or about March 27, 2022, on another intercepted wire communication between BROOKS, using Target Phone 1, and BIRT, using the Birt Phone (TP1 Session 6092), BROOKS discussed with BIRT turning in $3,900 to CARLOS JAMES for a supply of narcotics.

240.   Further, as discussed above, on or about April 7, 2021, BROOKS told law enforcement officials that, on a "good day," he sells up to 9 jabs of heroin (approximately 126 blows).

241.   Accordingly, based on an estimate that BROOKS provided directly to law enforcement officials, BROOKS alone was responsible for distributing at least 50 to 75 grams of heroin per day.

---

[59]     In some of the intercepted calls, BROOKS discussed the sale of narcotics with customers and members of the CARLOS JAMES DTO, but did not reference specific quantities or units of narcotics.  The analysis above does not include those calls. Additionally, BROOKS and CARLOS JAMES discussed selling crack cocaine, but did not specify quantities.

242.    While the volume of narcotics trafficked on a given day varied based on, among other things, the size of customer orders, surveillance, intercepted communications and interviews, based upon the foregoing, I believe that, on average, the CARLOS JAMES DTO was selling at least 52 to 78 grams of heroin per day over the course of approximately 449 days from April 7, 2021, and August 31, 2022.  Based on the information described above, including the statements made by BROOKS, surveillance, and wire interceptions, I believe that between on or about April 7, 2021 and August 31, 2022 members of the CARLOS JAMES DTO possessed with intent to distribute and distributed at least 35 kilograms of fentanyl-laced heroin and at least 1.1 kilograms of crack cocaine.

## **CONCLUSION**

187.    Based on the foregoing, I respectfully submit that there is probable cause to believe that beginning no later than April 7, 2021 and continuing to in or about August 31, 2022, in the Northern District of Illinois and elsewhere, defendants CARLOS JAMES, SAMUEL BROOKS, VASHON JAMES, THOMAS BIRT, FELICIA SINGLETON, DAVID LAMB, AVIS KNIGHT, and HAYDEE CANO did conspire with each other, and with others known and unknown to knowingly and intentionally possess with intent to distribute and distribute a controlled substance, namely, 400 grams or more of a mixture and substance containing a detectable amount of fentanyl (N-phenyl-N-[1-(2-phenylethyl)-4-piperindinyl] propanamide), a Schedule II Controlled Substance, one kilogram or more of a mixture and substance containing a detectable amount of heroin, a Schedule I Controlled Substance, and a mixture and

substance containing a detectable amount of cocaine base, a Schedule II Controlled Substance, in violation of Title 21, United States Code, Section 841(a)(1), all in violation of 21 U.S.C. § 846.

FURTHER AFFIANT SAYETH NOT.

BLAIR SANTASPIRT
Special Agent, Federal Bureau of Investigation

SUBSCRIBED AND SWORN to before me by telephone on October 13, 2022.

Honorable BETH W. JANTZ
United States Magistrate Judge

103